# Illinois Official Reports

## Appellate Court

*231 W. Scott, LLC v. Lakeside Bank*, 2017 IL App (1st) 161131

| | |
|---|---|
| Appellate Court Caption | 231 W. SCOTT, LLC; DAVID E. RANSBURG; and MARK RANSBURG, Plaintiffs-Appellees, v. LAKESIDE BANK; JLL CONSTRUCTION SERVICES, INC.; JERRY L. LEWIS; LIEGGI LAW OFFICES, LLC; CRYSTAL CAISON; MAYER JEFFERS GILLESPIE; and GREATER ILLINOIS TITLE COMPANY, Defendants (Greater Illinois Title Company, Defendant-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-16-1131 |
| Filed | June 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-6136; the Hon. Thomas J. Lipscomb, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Newman, Boyer & Statham, Ltd. (Ardwin E. Boyer, of counsel), and Law Offices of Neal M. Goldberg (Neal M. Goldberg, of counsel), both of Chicago, for appellant.<br><br>Law Offices of Al Hofeld, Jr., LLC, of Chicago (Al Hofeld, Jr., and Hanan Van Dril, of counsel), for appellee.<br><br>Stahl Cowen Crowley Addis, LLC, of Chicago (Ronald A. Damashek, of counsel), *amicus curiae*. |

| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. |
| | Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial in Cook County circuit court, the trial court entered judgment against defendant Greater Illinois Title Company (GIT) and in favor of plaintiff 231 W. Scott, LLC (LLC), concluding that GIT had breached its fiduciary duty as construction escrowee to the LLC. According to the trial court, given the number of problems in the construction process, GIT owed a duty to the LLC to, at a minimum, inquire into the problems and, if warranted, investigate further, including conducting an "informal viewing" of the construction project. On appeal, GIT argues (1) that the trial court erred in concluding that GIT's fiduciary responsibilities to the LLC included the duty to investigate construction problems before disbursing payments and (2) even if GIT did breach its fiduciary duties to the LLC, that breach was not the proximate cause of the LLC's damages. For the reasons that follow, we reverse the judgment against GIT.

¶ 2                                        BACKGROUND

¶ 3    On March 24, 2015, the plaintiffs, David E. Ransburg (David), Mark Ransburg (Mark), and the LLC filed their second amended complaint against the defendants, Lakeside Bank (Lakeside), JLL Construction Services, Inc. (JLL), Jerry L. Lewis, Lieggi Law Offices, LLC (Lieggi Law), Crystal Caison, Mayer Jeffers Gillespie (MJG), and GIT. In the complaint, the plaintiffs brought a number of claims against the various defendants, all of which arose out of the attempted, but failed, renovation of a three-flat home at 231 W. Scott Street, Chicago.

¶ 4    Although the complaint raised numerous claims against each of the defendants, only two were leveled against GIT. In count XX of the complaint, the plaintiffs alleged that GIT breached the escrow agreement between the LLC, GIT, and Lakeside by disbursing funds to JLL without a sworn statement from the plaintiffs. In count XXIII of the complaint, the plaintiffs alleged that GIT breached its fiduciary duty to the LLC by failing to conduct independent inspections of the renovation work (to insure its completion and quality) prior to disbursing escrow funds.

¶ 5    Ultimately, the plaintiffs proceeded to trial on three claims against JLL (breach of contract, common-law fraud, and violation of the Illinois Consumer Fraud Act), one claim against MJG (breach of contract), and the LLC's claim of breach of fiduciary duty against GIT. The breach of contract and common-law fraud claims against JLL, along with the breach of contract claim against MJG, were heard by a jury. The claims for violation of the Illinois Consumer Fraud Act against JLL and breach of fiduciary duty against GIT were heard in a bench trial.

¶ 6    Because all of the claims that went to trial were tried together, the trial record is voluminous, and not all of the evidence presented at trial was relevant to the breach-of-fiduciary-duty claim against GIT. Accordingly, in an effort to conserve resources,

we recount only that evidence that has some bearing on the resolution of the LLC's claim for breach of fiduciary duty.

¶ 7 At trial, the evidence tended to establish the following. The home at issue had been in David and Mark's family since the 1920s. In 2006, brothers David and Mark decided to renovate the building and together formed the LLC for that purpose. All of the defendants played a role in the attempted renovation. Lakeside was the lender who extended the construction loan to the LLC, while Lewis and his company, JLL, served as the general contractor retained to perform the renovation work. Caison, who was an attorney with Lieggi Law, acted as counsel for the plaintiffs during the renovation process. MJG was the architectural firm retained by Lakeside to inspect the project as it progressed. Finally, GIT was the escrow agent, charged with disbursing the loan proceeds to JLL and Lewis as work progressed.

¶ 8 Under the construction loan escrow agreement (Escrow Agreement) signed by the LLC (by David), Lakeside, GIT, and JLL, before GIT would disburse any funds, the LLC was to "give or cause others to give GIT" the following documents: a current sworn owner's statement, a current sworn general contractor's statement, enough funds to cover the amount of the current disbursement request, a written statement[1] approving the current disbursement, a report by an inspector or architect certifying that the reported work had been completed and materials were in place, and any necessary waivers or releases of liens or affidavits. In addition, after the initial disbursement, Lakeside was to provide GIT with any loan funds that were to be used to pay the current request.

¶ 9 The Escrow Agreement also provided: "GIT-Escrowee and GIT has the right to verify all information contained in any STATEMENTS provided to them. If GIT-Escrowee or GIT discovers any inaccuracies in these statements, GIT-Escrowee may stop disbursing until the inaccuracies are corrected." In addition, the Escrow Agreement contained the following disclaimers:

"GIT-Escrowee does not at any time insure: A. That there will be enough funds available to completed [*sic*] the project; B. That the project will be completed; or C. If the project is completed that it will be completed according to plans and specifications approved by OWNER and LENDER.

GIT-Escrowee does not assume any liability for loss caused by errors in certifications provided by others as to work in place."

¶ 10 Needless to say, the renovation of the home at 231 W. Scott Street did not go as planned. Although intended to be an eight-month project starting in June 2006, the project was never completed after JLL failed to return to the job. Not only was the project not completed, but the plaintiffs also presented evidence that much of the work that was performed, was performed incorrectly, some of which then led to flooding and water damage. In 2009, Lakeside filed foreclosure proceedings against the property. As a result of the failed renovation, the plaintiffs claimed that they suffered extensive financial damages.

¶ 11 With respect to the breach-of-fiduciary-duty claim against GIT, the plaintiffs presented the expert testimony of Stephen A. James, a licensed general contractor, construction engineer, and construction consultant. According to James, at the time of the renovation project, when a

---

[1]The Escrow Agreement does not specify who must author the statement.

construction loan escrowee knew or should have known of potential or actual inaccuracies in a contractor's statement, it was the industry custom and practice for the escrowee to verify the contractor's statements, including by way of on-site inspections of the contractor's work. In this particular case, it was James's opinion that there existed five "red flags" to put GIT on such notice: (1) GIT's files for the 10 pay requests made on the project did not contain the inspecting architect's approval for 5 of the requests, (2) GIT's files did not contain the owner's approval on 2 of the requests, (3) GIT was aware that the plaintiffs did not have their own inspecting architect, (4) there were gaps of four to six months between some of the disbursements, and (5) GIT's files indicated that multiple pay requests were not approved and had to be resubmitted, suggesting there had been errors in the contractor's original requests. Based on these factors, James opined that GIT should have stopped disbursing loan funds until it verified the accuracy of the contractor's statement, including through on-site inspections of the property to ascertain that the claimed work had been completed in a workmanlike manner.

¶ 12    James testified on cross-examination, however, that he reviewed the files of Lakeside and MJG and both of those entities possessed all 10 signed approvals from the inspecting architect. James did not, at any time, compare the work and materials claimed in each draw request to the work and materials approved by David. Finally, James acknowledged that neither David nor Mark informed him of possible delays in the construction process, namely, that the basement had to be dug out by hand, that the construction loan had to be renewed on multiple occasions, and that there were outstanding tax liabilities on the property that had to be resolved before disbursement.

¶ 13    David testified that during the course of the renovation, he was presented with only eight pay requests, all of which he signed. David signed off on each of those requests because he believed that the statements constituted representations by JLL that the listed work had been completed and because he believed MJG was hired for his protection and had inspected JLL's work upon every pay request. If he had known that the listed work was not complete or that MJG had not inspected the work, he would not have signed the pay requests. David acknowledged that he visited 231 W. Scott Street on a weekly basis during the renovation project and was able to view the progress himself before signing the various pay requests.

¶ 14    Mark testified that he visited 231 W. Scott Street on a nearly daily basis during the renovation. At times, Mark would visit the property to verify Lewis's statements that certain work had been completed and would find that the work had not, in fact, been completed like Lewis claimed. Despite having concerns about the progress of the renovation work, Mark never told David to not sign off on any of the pay requests.

¶ 15    Lewis testified that in his experience he has never seen a title company visit a construction site. Rather, the process for pay requests was as follows: JLL would submit a pay request to Lakeside and the LLC, and Lakeside would then ask MJG to conduct its inspection of the claimed work. At some point thereafter, by some means unknown to Lewis, the contractor's statement, the owner's statement, and the architect's certification would be submitted to GIT. GIT would then call Lewis to request the necessary waivers. Once JLL delivered the waivers, GIT would disburse payment. To Lewis's knowledge, all of the pay requests were authorized by the LLC. Lewis also explained that pay requests might go through a number of revisions based on the architect's inspection and that, as a result of these inspections, JLL's numbering of the pay requests might not match the draw number assigned by GIT. GIT would not have been privy to the revisions of the pay requests.

- 4 -

¶ 16    Douglas Gillespie of MJG testified that he was the inspecting architect for the plaintiffs' renovation project. He testified that he signed off on all 10 of the pay requests for the project after conducting the necessary inspections. He also testified that in his experience, he has never seen a title company conduct an inspection of a construction project prior to disbursement.

¶ 17    Liz Zepeda testified that at the time of the renovation on 231 W. Scott Street, she worked as a construction escrow clerk with GIT. Upon being shown the files for the project's pay requests, Zepeda acknowledged that the files for requests 5, 6, 8, and 9 did not contain the property owner's signature approving the request. She also testified that the files for requests 6, 7, and 8 did not contain an architect's approval for disbursement. On cross-examination, however, Zepeda testified that the handwriting on the front covers of requests 5 through 8 showed that she had filled in the dates on which GIT received the owner's and architect's disbursement approvals for each of those requests. According to Zepeda, there was no reason for her to have filled in those dates unless GIT had, in fact, received those documents. In addition, upon being shown the file for request 10, Zepeda identified the owner's approval of pay request 9, which had apparently been misfiled under pay request 10.

¶ 18    Melinda Janczur, a construction escrow officer with GIT, confirmed Zepeda's testimony that there would have been no reason to fill in received dates for documents on pay requests unless GIT had actually received those documents.

¶ 19    Finally, Paul Peterson, vice president and general counsel for Chicago Title Insurance Company and vice president and senior underwriter for a number of other title insurance companies, testified as an expert on GIT's behalf. More specifically, he testified that the role of title insurance companies is primarily to insure the title of the property and protect the priority of the mortgage from any mechanics liens that might arise during the construction process. To that end, the provision in the Escrow Agreement providing GIT with the right to verify any inaccuracies in the contractor's statement was necessary to protect the title from any sort of liens. For example, if a general contractor were to submit a pay request that included a request for payment to a subcontractor but the subcontractor claimed that he was owed more than was listed in the request, the title company had the right to verify the correct amount owed to the subcontractor, so as to avoid any liens being put on the property by the subcontractor. Similarly, if a subcontractor claimed that he was entitled to payment for services that were not reasonably within the scope of his services, the title company had the right to verify that the subcontractor was, in fact, responsible for those services.

¶ 20    Peterson also testified why imposing a duty to inspect and/or verify the amount and quality of work performed by the contractor is impractical. First, without having the precise plans and materials for a project, the costs of the materials, the invoices from the various subcontractors, or the expertise in assessing the progress of a construction project in relation to the end goal, the title company has no ability to assess the percentage of the work completed on a project at any given time. Second, the title company does not possess the requisite construction knowledge to assess whether the work has been performed in a workmanlike manner and consistently with industry standards and codes. Third, the title company would be subject to liability if it undertook to inspect construction projects without the requisite expertise. In his experience in the title insurance industry, Peterson had never heard of a title company conducting an inspection of a construction project.

¶ 21    With respect to the plaintiffs' renovation project, in particular, Peterson noted that there was an owner's signature approving pay request 10. Because pay request 10 also listed all of

the previous payments in addition to the current payments, it was Peterson's opinion that by signing pay request 10, the owner was necessarily approving all of the previous pay requests.

¶ 22 Following the presentation of evidence and closing arguments, the jury awarded the LLC $172,000 on its claim for breach of contract against JLL, but it found for JLL and MJG on the other jury claims. With respect to the bench trial claims, the trial court found JLL and GIT to be jointly and severally liable to the LLC in the amount of $550,000. The trial court also found JLL and GIT were both entitled to a setoff of $172,000.

¶ 23 Following posttrial motions filed by the plaintiffs, JLL, and GIT, the trial court reduced the amount of the judgment against JLL and GIT to $525,000. The trial court, however, denied all other requested posttrial relief.

¶ 24 GIT then filed this appeal.

¶ 25                                          ANALYSIS

¶ 26 On appeal, GIT argues that the judgment against it should be reversed for two reasons: (1) it did not owe a fiduciary duty to the LLC to verify the amount of work completed and the quality of the work performed before making disbursements, and (2) even if it did owe and breach such a fiduciary duty, that breach was not the proximate cause of the LLC's damages. We conclude that the former contention is determinative of this appeal.

¶ 27 Before reaching the merits of GIT's contentions, however, we first address the LLC's contention that GIT has waived its argument with respect to the scope of its fiduciary duty. According to the LLC, because GIT failed to raise its contention in a motion for summary judgment prior to trial, it has waived the issue on appeal. In support of its waiver argument, the LLC cites authority for the proposition that issues raised for the first time on appeal are waived. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996); *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 456 (2007). The LLC does not argue, however, that GIT did not raise the duty issue in the trial court at all, only that GIT failed to raise it in a motion for summary judgment.

¶ 28 According to the LLC, the case of *Village of Arlington Heights v. Anderson*, 2011 IL App (1st) 110748, ¶ 15, stands for the proposition that "[t]heories not raised during summary judgment proceedings are waived on review." Although *Anderson* does contain the quoted language, in order to construe it in the manner the LLC suggests, one would have to, as the LLC appears to have done, completely divorce that language from the surrounding context. In making the quoted statement, the court in *Anderson* was discussing the defendants' objection to an affidavit submitted in support of the plaintiff's motion for summary judgment. *Id.* Although the defendants had objected to the sufficiency of the affidavit during summary judgment proceedings in the trial court, they had not objected on the basis that they raised on appeal. *Id.* Accordingly, the appellate court held that the defendants had waived that basis for objection. *Id.* From this, it is apparent that the *Anderson* court's statement that theories must be raised during summary judgment to avoid waiver on appeal applied only to the context in which it was made—arguments related to the grant or denial of summary judgment. In no way does *Anderson* support the premise that arguments may not be raised on appeal if not first raised in a motion for summary judgment, and we need not point out the absurdities that would result if such were the rule.

¶ 29 The LLC also argues that GIT waived the duty argument because it appealed from the trial court's grant of judgment in favor of the LLC and the denial of GIT's posttrial motion, rather than from the denial of GIT's pretrial motion *in limine* to exclude any evidence of a duty or failure to inspect by GIT. The LLC fails to recognize, however, that "a notice of appeal will be deemed to include an unspecified interlocutory order where that order was a step in the procedural progression leading to the judgment specified in the notice of appeal." *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016 IL App (1st) 151864, ¶ 70. Thus, to the extent that GIT's challenge to the trial court's finding on the breach-of-fiduciary-duty claim is related to the denial of the motion *in limine*, GIT's failure to specifically list the motion *in limine* order in its notice of appeal is not fatal. See *id.* ¶ 71 (trial court's ruling on the motion *in limine* was a step in the procedural progression leading to the judgment appealed from).

¶ 30 Turning now to the merits of GIT's argument with respect to the scope of its fiduciary duty, GIT contends that the question of whether it owed a duty to inspect and verify JLL's work is a question of law that should be reviewed *de novo*. The LLC, on the other hand, contends that the trial court's determination that GIT breached its fiduciary duty to the LLC should be reversed only if it is against the manifest weight of the evidence. We agree with GIT that the appropriate standard of review in this matter is *de novo*. The question presented here is whether the scope of GIT's fiduciary duty included an obligation to verify the completion and quality of JLL's work, not whether GIT actually did or did not fulfill its obligation. See *Smith v. First National Bank of Danville*, 254 Ill. App. 3d 251, 261 (1993) (scope of trustee's fiduciary duty to beneficiary was question of law to be reviewed *de novo*).

¶ 31 In finding that GIT, as escrowee, violated its fiduciary duty to the LLC to verify the scope and quality of JLL's work, the trial court noted that the facts that the project took much longer than anticipated and that there were large gaps in time between disbursements should have indicated to GIT that there were problems with the project and, as a result, GIT should have conducted some further verification starting around the time of the seventh payment request. More specifically:

> "GIT could have and should have at least made an inquiry of the parties involved to ascertain problems causing the delays and, if warranted, investigate further. However, this Court does not rule that GIT has a duty to conduct a professional inspection, but an informal viewing of the project, if warranted, is not out of the question. The next question is when should the inquiry be made. To do so at the end of the project would not protect plaintiff's interest. In this case, the 7th draw was 18 months after the start of the project and more than twice the initial completion period. GIT's inquiry in this case should have been made on or about that time. Therefore, GIT breached its fiduciary duty under the specific circumstances of this case by failing to make the above inquiry."

In so holding, the trial court found that "GIT's fiduciary duty was not limited by GIT's contractual obligations as escrowee nor was its fiduciary duty to plaintiff limited by any contractual obligations or custom and practice regarding the issuance of its title policy to the bank."

¶ 32 A claim for breach of fiduciary duty requires a showing that a fiduciary duty exists, that duty was breached, and the breach was the proximate cause of the plaintiff's damages. *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 122 (2004). In this case, there is no

question that, as escrowee, GIT owed a fiduciary duty to the LLC. GIT owed a fiduciary duty to both the party making the deposit (Lakeside) and the party for whose benefit the deposit was made (the LLC). *Id.* at 123. Because of this dual fiduciary duty, GIT was required to act impartially to each of the parties (*Wells Fargo Bank Minnesota, NA v. Envirobusiness, Inc.*, 2014 IL App (1st) 133575, ¶ 40) and "owe[d] a duty to act only in accordance with the escrow instructions" (*Moyer*, 347 Ill. App. 3d at 123; *Toro Petroleum Corp. v. Newell*, 33 Ill. App. 3d 223, 228 (1974)). "Where the conditions of the escrow have been satisfied, the escrowee is under an obligation to deliver the subject matter deposited with him to the grantee or obligee, whereas if the conditions of the escrow are not met, the escrowee must return the subject matter to the depositor." *Columbia Homes, Inc. v. Sirois*, 115 Ill. App. 3d 651, 653 (1983).

¶ 33    Cases over the years have consistently held escrowees to their fiduciary duty to act only and strictly in accordance with the escrow instructions and have held escrowees accountable for acting outside said instructions. See, *e.g.*, *Moyer*, 347 Ill. App. 3d at 124 (where the governing contract did not include instructions for what to do with the escrowed funds if the contract did not close, the escrowee was required to continue to hold the funds for the mutual benefit of the parties); *McBride v. Commercial Bank of Champaign*, 101 Ill. App. 3d 760, 765 (1981) ("The fact that it was faced with conflicting instructions and demands did not give the Bank the right to favor one party over the other, but rather placed the Bank upon notice that in obeying the instructions of one and disregarding those of the other, it acted at its peril. [Citations.] An escrowee which is willing to ignore the instructions of one of its principals in order to comply with the instructions of the other cannot escape being held accountable for its actions."); *Toro*, 33 Ill. App. 3d at 228-29 (escrowee's disbursement was a breach of its fiduciary duty where the escrow instructions permitted the escrowee to act only upon the joint written direction of the parties, but the disbursement order did not contain the signature of one of the parties).

¶ 34    The LLC attempts to argue that the rule that an escrowee has a fiduciary duty to act only in accordance with the escrow instructions does not mean that the escrowee's duties are limited to the escrow instructions. In other words, the LLC contends that the escrowee could have additional fiduciary duties other than acting in accordance with the escrow instructions. The problem with this contention, of course, is that, in this particular case, imposing a fiduciary duty on GIT to inspect the progress and quality of JLL's work would require GIT to perform an act not required by the Escrow Agreement. The court in *Fantino v. Lenders Title & Guaranty Co.*, 303 Ill. App. 3d 204 (1999), faced a similar situation and declined to expand the escrowee's duties beyond what was required by the escrow agreement.

¶ 35    In that case, the plaintiffs entered into a contract with the general contractor for the construction of a home. *Id.* at 205. The defendant served as the escrowee for the disbursement of funds to the general contractor. *Id.* at 205-06. As is usually the case in construction matters that come before us, the construction process did not end well for the plaintiffs, with faulty construction and multiple subcontractor and materialman liens being filed on the property. *Id.* at 206. After settling with the various lienholders, the plaintiffs filed suit against the defendant, alleging breach of contract and breach of fiduciary duty. *Id.* With respect to the latter claim, the trial court found that the defendant breached its fiduciary duty as escrowee by failing to conduct proper inspections for the plaintiffs, failing to procure proper lien waivers (the general contractor was alleged to have forged them), and failing to procure the plaintiffs' written authorization before releasing funds. *Id.* at 208.

¶ 36    In reversing the trial court's judgment, the appellate court noted that the escrow agreement provided in relevant part that the defendant was (1) to disburse funds upon order of the lender, (2) authorized to conduct inspections of the project on behalf of and for the benefit of the lender, and (3) to secure the appropriate lien waivers for any amounts paid. *Id.* Because the escrow agreement did not require the plaintiffs' authorization to disburse funds or that the defendant conduct inspections of the project for the plaintiffs, the appellate court concluded, "It is clear that defendant did not violate any duty owed to the [plaintiffs] by disbursing funds without their *authorization* or by failing to conduct inspections on behalf of the [plaintiffs]." (Emphasis in original.) *Id.* at 209. The appellate court also found that notwithstanding the forged lien waivers, the plaintiffs failed to demonstrate that the amounts disbursed did not match the amounts on the waivers. *Id.* Accordingly, the appellate court reversed the judgment against the defendant, finding that the trial court's finding that the defendant breached its fiduciary duty to the plaintiffs was against the manifest weight of the evidence. *Id.*

¶ 37    Like in *Fantino*, the LLC alleges that GIT breached its fiduciary duty as escrowee by failing to conduct inspections to verify the progress and quality of the work performed by JLL prior to making any payment disbursements. Also like in *Fantino*, although not prohibiting such inspections, the Escrow Agreement did not require GIT to conduct inspections for the LLC's benefit, regardless of how many "red flags" might be present. Rather, the Escrow Agreement simply provided that "GIT-Escrowee and GIT has the *right* to verify all information contained in any STATEMENTS provided to them. If GIT-Escrowee or GIT discovers any inaccuracies in these statements, GIT-Escrowee *may* stop disbursing until the inaccuracies are corrected." (Emphases added.) The use of the words "right" and "may" instead of "duty" and "shall" indicates the provision was intended to be permissive rather than mandatory. See *Professional Executive Center v. La Salle National Bank*, 211 Ill. App. 3d 368, 379 (1991) ("Illinois courts interpret the word 'may' as permissive and 'shall' as mandatory in private contracts."). In addition, the Escrow Agreement contains an express disclaimer by GIT of any responsibility if the project is not completed according to the plans and specifications or for losses caused by errors in certifications of the work performed. Without question, such a disclaimer is entirely inconsistent with an idea that GIT was required to verify the progress and quality of JLL's work.

¶ 38    In one of its many footnotes,[2] the LLC attempts to distinguish *Fantino* on the basis that the plaintiffs unsuccessfully sued for breach of a contract to which they were not a party. While this is true, it is a distinction without a difference. Neither GIT nor we rely on the discussion of the breach-of-contract claim in *Fantino*. Instead, our focus is entirely on the analysis of the claim for breach of fiduciary duty based on an escrow agreement to which the plaintiffs were parties. See *Fantino*, 303 Ill. App. 3d at 205-06. Moreover, the *Fantino* court's analysis of the breach-of-contract claim in that case has no bearing on its (or our) analysis of the breach-of-fiduciary-duty claim in the present case.

¶ 39    Because GIT, as escrowee, had a fiduciary duty to act only in accordance with the terms of the Escrow Agreement, it cannot have violated its fiduciary duty by failing to inspect JLL's work for progress and quality because the Escrow Agreement imposed no such obligation.

_____

[2]In the span of 46 pages, the LLC's brief contained 30 footnotes, some of which took up nearly one-third of the page, single spaced. For future reference, we refer counsel to Illinois Supreme Court Rule 341(a) (eff. Jan. 1, 2016), which expressly states that footnotes in appellate briefs are discouraged.

¶ 40    Relying primarily on the case of *Miller v. Harris*, 2013 IL App (2d) 120512, both the trial court and the LLC reach the conclusion that GIT's fiduciary duty was not limited by the Escrow Agreement. In particular, both the trial court and the LLC quote the language of *Miller* in which the Second District stated:

> "But fiduciary duties arise as a matter of law from the relationship between the parties, not from documents. [Citation.] A claim for breach of fiduciary duty is not 'founded on' a contract, even if the parties' relationship that gives rise to the fiduciary duty is based on a contract. Rather, [a] fiduciary duty is founded upon the substantive principles of agency, contract, and equity." (Internal quotation marks omitted.) *Id.* ¶ 19.

Our holding is not inconsistent with this premise. Although the fiduciary relationship itself may be *created* by legal principles independent of the Escrow Agreement, that does not mean that the *scope* of the fiduciary duty cannot be defined by the Escrow Agreement. As discussed above, this is exactly how the existing body of case law has defined the scope of an escrowee's fiduciary duty for years.

¶ 41    In addition, the LLC's contention that *Miller* "rejected" the idea that an escrowee's obligations are limited to the escrow instructions is simply wrong. The rules governing the scope of an escrowee's fiduciary duty are particular to escrowees, as they are in the unique position of being the simultaneous fiduciary to two different parties. The breach-of-fiduciary-duty claim in *Miller* was leveled against an accountant providing tax services, not an escrowee. Accordingly, the court in *Miller* had no occasion to address the scope of an escrowee's fiduciary duty, much less reject it.

¶ 42    Notably, the LLC has not cited any authority for the proposition that, despite the longstanding rule that an escrowee must only act in accordance with the escrow instructions, an escrowee facing similar circumstances as GIT owes a fiduciary duty to verify the progress and quality of a general contractor's work. Nor has the LLC provided any sort of legal or policy analysis as to why, despite the absence of existing case law in support, an escrowee's fiduciary duty should be extended to include a duty to verify the progress and quality of a general contractor's work under such circumstances.

¶ 43    The LLC also argues that to hold that the scope of GIT's fiduciary duty did not extend beyond the obligations imposed by the Escrow Agreement is to make a claim for breach of fiduciary duty identical to a claim for breach of contract, which, in turn, would render the claim for breach of fiduciary duty meaningless. We hardly think that the fact that a set of facts may give rise to both a claim for breach of contract and breach of fiduciary duty means that the latter has been eradicated. In fact, it is a rare occurrence in litigation when a plaintiff does not allege multiple causes of action arising from a single set of facts. Oddly enough, the plaintiffs themselves engage in this practice in the complaint, alleging the same facts as the basis of a number of their claims against the various defendants.

¶ 44    The LLC spends a considerable amount of time discussing the five "red flags" that it argues put GIT on notice of problems with the renovation project. There is no need for us to get into the merits of these "red flags" because their existence or nonexistence has no bearing on the fact that the Escrow Agreement—which defines the scope of GIT's fiduciary duty—does not require GIT to conduct any verification under any circumstances, no matter how awful they might be.

¶ 45 Nevertheless, because the parties spent a fair amount of time at oral arguments discussing the absence of owner's and architect's approvals from GIT's files for a number of draws, we pause briefly to comment on this topic. Although the LLC uses the missing approvals to imply that GIT's claimed adherence to the strict terms of the Escrow Agreement is disingenuous (because disbursing funds without the required approvals would violate the terms of the agreement) and as evidence that GIT should have known of the construction issues, the LLC completely ignores James's—the LLC's own expert—testimony that, although the GIT files were missing a number of architect approvals, he observed all 10 signed architect approvals in the files of Lakeside and MJG. In addition, Gillespie testified that he signed all of the architect approvals, and the record includes a signed owner approval for the final draw, which identified all of the work JLL claimed had been completed on the project. More importantly, despite placing a magnifying glass on the missing approvals, the LLC never alleged that GIT breached the Escrow Agreement by disbursing funds without architect approval, and its claim that GIT breached the Escrow Agreement by disbursing funds without owner approval was never brought to trial.

¶ 46 In sum, in accord with the holding of *Fantino* and the well-established principle that escrowees may only act in accordance with the escrow instructions, GIT cannot be said to have breached its fiduciary duty by failing to perform an act that the Escrow Agreement does not require, and therefore, the trial court's determination to the contrary was error. Because we conclude that the trial court's determination that GIT breached its fiduciary duty to the LLC requires reversal, we need not address GIT's contention that any breach was not the proximate cause of the LLC's damages.

¶ 47                                            CONCLUSION

¶ 48 For the foregoing reasons, the judgment of the circuit court of Cook County against Greater Illinois Title Company, Inc. is reversed. The judgments against the other defendants remain.

¶ 49 Reversed.