2025 IL App (1st) 240276
No. 1-24-0276

SIXTH DIVISION
November 21, 2025

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| JEFFERY SCHAFF and MICHELE SCHAFF, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| | ) | |
| Plaintiffs-Appellants and Cross-Appellees, | ) | |
| | ) | |
| v. | ) | No. 2019 L 007588 |
| | ) | |
| TRAVELERS HOME AND MARINE INSURANCE COMPANY; THE PHOENIX INSURANCE COMPANY; G.W. NITZSCHE, INC., d/b/a Servpro of Wheaton/Glen Ellyn; and HUB INTERNATIONAL MIDWEST, LTD., | ) ) ) ) ) | The Honorable Daniel J. Kubasiak, Judge Presiding. |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| (Hub International Midwest, Ltd., | ) | |
| | ) | |
| | ) | |
| Defendant-Appellee and Cross-Appellant). | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1       In the aftermath of a July 2017 sewage backup at their residence, plaintiffs-appellants

Jeffery and Michele Schaff sued their insurer, Travelers Home and Marine Insurance Company

and the Phoenix Insurance Company (together, Travelers); their insurance agent, Hub International Midwest, Ltd. (HUB); and the company that performed work to remediate damage to the residence, G.W. Nitzsche, Inc., d/b/a ServPro of Wheaton/Glen Ellyn (ServPro).

¶ 2       Plaintiffs alleged, *inter alia*, that Travelers owed coverage up to policy limits for damage to their home from sewage bacteria that became "aerosolized" and spread throughout the home. Plaintiffs sued HUB for failing to properly guide them and correct errors by Travelers, in the claim handling process. Plaintiffs also alleged that ServPro did not adequately perform remediation work. Servpro filed a counterclaim against plaintiffs for breach of contract.

¶ 3       Pursuant to motions to dismiss, the trial court dismissed a number of plaintiffs' claims. After motions for summary judgment, the court entered an order on plaintiffs' breach of contract claim against Travelers that found that Travelers' coverage liability (beyond amounts already paid) was limited to $5,000 under the policy. The court separately granted summary judgment in favor of ServPro with respect to plaintiffs' breach of contract claim and ServPro's counterclaim. The court also granted summary judgment to HUB on the remaining count (breach of contract) against it.

¶ 4       Plaintiffs now appeal from the trial court's determination that Travelers' coverage obligation for damage from "aerosolized" sewage bacteria was limited to $5,000. Plaintiffs also appeal the dismissal of their remaining claims against Travelers, based on section 155 of the Illinois Insurance Code (Insurance Code) (215 ILCS 5/155 (West 2018)), *respondeat superior*, and the Consumer Fraud And Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2018)). With respect to HUB, plaintiffs appeal the dismissal of their Consumer Fraud Act, negligence, and breach of fiduciary duty claims. With respect to ServPro, plaintiffs

challenge the dismissal of the Consumer Fraud Act claim, as well as the entry of summary judgment in ServPro's favor on plaintiffs' breach of contract claim and ServPro's counterclaim.

¶ 5 In addition, HUB cross-appeals the trial court's denial of its request for Rule 137 (Ill. S. Ct. R. 137 (eff. Jan. 1, 2018)) sanctions against plaintiffs' counsel.

¶ 6 For the reasons below, we reverse the court's determination as to the breach of contract claim against Travelers and remand for further proceedings; we find that plaintiffs have alleged and may be able to prove that they are entitled to additional coverage for "direct physical loss" from "water-borne" materials, notwithstanding the separate policy provision limiting coverage to $5,000 where an insured peril "results in" microbes. However, we affirm the dismissal of plaintiffs' other claims against Travelers.

¶ 7 We also affirm the dismissal of the claims against HUB. However, we reverse the dismissal of the Consumer Fraud Act and negligence claims against ServPro, and we find questions of fact precluded entry of summary judgment in ServPro's favor on plaintiffs' breach of contract claim and ServPro's counterclaim.

¶ 8 With respect to HUB's cross-appeal, we decline to find the court erred in declining to award Rule 137 sanctions.

¶ 9 We thus affirm in part and reverse in part. We remand for further proceedings consistent with this opinion.

¶ 10         I. BACKGROUND

¶ 11 This action arises from a July 2017 sewage backup at plaintiffs' residence in Lake Forest, Illinois. Plaintiffs were insured by Travelers. Defendant Hub International Midwest Insurance, Ltd. (HUB) was plaintiffs' insurance agent.

¶ 12                         A. The Insurance Policies

¶ 13       Travelers issued a "High Value Homeowners Policy" to plaintiffs, which was in effect as of July 2017. The policy set forth a number of property coverages, including coverage A for the dwelling (with a limit of $840,000), coverage C for personal property (with a limit of $630,000), and coverage D for "loss of use" (with a limit of $420,000).

¶ 14       The policy set forth a number of "Exclusions," including for "Water Damage" and "Fungi, Other Microbes or Rot." However, the exclusions were modified by a number of "Additional Coverages." These included Additional Coverages 20 and 22, whose application is disputed in this appeal.

¶ 15       Additional Coverage 20 (AC 20) was entitled "Limited 'Fungi', Other Microbes Or Rot Remediation." It provided:

> "If a loss caused by a Peril Insured Against results in 'fungi,' other microbes or rot, we will pay for:
>
> (1) Remediation of the 'fungi,' other microbes or rot. This includes payment for the reasonable and necessary cost to:
>
>     (a) Remove the 'fungi,' other microbes or rot from covered property or to repair, restore or replace that property; and
>
>     (b) Tear out and replace any part of the building as needed ***;
>
> (2) Any reasonable and necessary increase in living expense you incur *** and
>
> (3) Any reasonable and necessary testing or monitoring of air or property to confirm the absence, presence or level of the 'fungi', other microbes or rot ***."

¶ 16     AC 20 also specified that "[t]he most we will pay under this additional coverage is the limitation of liability shown in the Declarations for Limited 'Fungi,', Other Microbes or Rot Remediation." The policy stated this limit was $5,000.

¶ 17     Additional Coverage 22 (AC 22) was entitled "Water Back-Up and Sump Discharge or Overflow." It provided, in relevant part:

> "We will pay up to the limit of liability shown in the Declarations for Coverage A *** and up to the limit of liability shown in the Declarations for Coverage C *** for direct physical loss, not caused by the negligence of an 'insured,' to property covered under Section I caused by water or water-borne material, which:
>
>> (1) Enters through or backs up from a sewer or drain located within the dwelling ***."

Thus, AC 22 afforded up to $840,000 in coverage for the dwelling (Coverage A) and up to $630,000 in coverage for damage to personal property (Coverage C) for "direct physical loss" caused by "water or water-borne material." The policy did not define the term "water-borne material" used in AC 22.

¶ 18     Travelers also issued a "Personal Articles Policy" to plaintiffs that provided coverage for certain specified items of personal property, including jewelry and art. The specific terms of the personal articles policy are not germane to the issues on appeal.

¶ 19                              B. The July 2017 Sewage Backup

¶ 20     On or about July 10, 2017, there was a sewage backup that caused sewage to enter the basement of plaintiffs' residence. Plaintiffs were out of town when the backup occurred.

¶ 21　　On the evening of July 27, 2017, plaintiffs returned to their home and discovered sewage in the basement. As alleged by plaintiffs in the operative complaint, "[a]lthough approximately 6,000 gallons of raw sewage had backed up *** only a small puddle remained. The sewage backup had become airborne and spread through the [residence] through the running HVAC unit and been absorbed into Plaintiffs' home and belongings."

¶ 22　　Plaintiffs contacted their insurance agent at HUB, John Doran. HUB filed a claim with Travelers the next morning, July 28, 2017. On that date, HUB also contacted ServPro about the sewage backup via e-mail.

¶ 23　　The next morning, July 29, 2017, Doran informed plaintiffs that workers were on the way to their home. As alleged by plaintiffs, later that day, three persons from ServPro arrived at the residence, along with an adjuster from Travelers, Justin Pallante.[1] According to plaintiffs, they were told they were required to allow ServPro to begin mitigation work at the residence or risk losing coverage for the damage to their home.

¶ 24　　Justin Graf of ServPro allegedly presented an iPad with three documents and told plaintiffs that "they needed to [electronically] sign before work could begin." Plaintiffs allegedly asked for time to read the documents, "but Graf informed them that there was no time" because "people were waiting on them to start work." Graf allegedly told plaintiffs that "the documents were not contracts" but that they only allowed ServPro permission to access the home, to receive payment from plaintiffs' insurers, and to charge plaintiffs if they prevented ServPro from retrieving its equipment.

¶ 25　　One of the three documents electronically signed by plaintiffs was entitled "Authorization to Perform Services and Direction of Payment" (the authorization). It stated, in part:

---

[1]Travelers has disputed that Pallante was present at the residence on that date.

"The undersigned customer *** authorizes the Provider [ServPro] *** to perform any and all necessary cleaning and/or restoration services on Customer's property located at the property address above, and with respect to items that need to be cleaned at a remote location to remove and clean such items as necessary.

Customer authorizes Travelers Insurance Company *** to pay Provider solely and directly for that portion of the work covered by Customer's Insurance Policy."

Elsewhere, the authorization stated that "Customer agrees that Provider [ServPro] is working for the Customer and not Customer's Insurance Company or any agent/adjuster." The authorization included several additional "Terms and Conditions."

¶ 26    As alleged by plaintiffs, ServPro told them that "the whole basement was ruined" and that most of the personal items in it could not be salvaged. ServPro subsequently performed mitigation work at the residence, although the parties dispute whether ServPro did so adequately. According to plaintiffs, ServPro did not follow "proper mitigation protocols" and failed to clean the entirety of the damage. ServPro allegedly kept the home's HVAC system running for several days, which allowed sewage-related bacteria to spread throughout the home. Plaintiffs also claim that ServPro failed to properly document numerous items of plaintiffs' personal property before discarding them.

¶ 27    On August 13, 2017, plaintiffs e-mailed Pallante at Travelers, expressing "concerns about ServPro." Plaintiffs claimed they "did not select ServPro" and that they "were told that we needed to meet with ServPro because it was our duty to mitigate the damages as soon as possible." They

stated: "When we met with Tim, Miles, and Justin [Graf] from ServPro that day and when we signed their agreement the next day, we expected that Travelers had selected them."

¶ 28    Among other concerns, plaintiffs stated that although ServPro had photographed items in the basement that were damaged or destroyed, ServPro had failed to provide the photographs to plaintiffs. Plaintiffs also asked for "a competent expert to test the basement to verify that the sewage biohazard has been properly remediated."

¶ 29    ServPro continued work at the residence for approximately two weeks. On August 16, 2017, plaintiffs e-mailed Graf at ServPro stating "your crews have completed most of the recovery and remediation work, but there are a few outstanding issues." Plaintiffs stated that they had the HVAC inspected and "learned that it needs to be replaced." They asked ServPro to clean the flooring under the old HVAC following its removal.

¶ 30    Plaintiffs also stated their concern that ServPro left the home "in a state that is conducive to the growth of mold" because ServPro had removed its dehumidifier, leaving the basement "damp and humid." Plaintiffs also stated that ServPro "did a poor job of documenting our belongings" and failed to provide photographs taken.

¶ 31    In response, Graf indicated ServPro's willingness to bring back dehumidifiers to the basement and to help after the HVAC replacement. Graf also stated that ServPro provided photos to plaintiffs on a USB drive. In response, plaintiffs wrote that the photographs provided by ServPro failed to include hundreds of items and that "the value of the missing items may well exceed $100,000."

¶ 32    In the same e-mail, plaintiffs stated they were "surprised" to receive an invoice from ServPro because "we were not the ones who hired you—Travelers did." Plaintiffs stated that "you

[Graf] required that I sign an authorization allow ServPro into our home to provide recovery and remediation services arranged by Travelers."

¶ 33     Plaintiffs separately communicated to Travelers that the HVAC needed to be replaced. Travelers responded that it would have another company, HVAC Investigators, inspect the unit. On August 29, 2017, Travelers (through Pallante) e-mailed plaintiffs, stating that HVAC Investigators found the furnace was repairable and could be sanitized for $1,282.50. Travelers approved that amount but did not approve a full replacement.

¶ 34     On or about August 31, 2017, plaintiffs called Brad Boyer of Travelers and complained. According to plaintiffs, at that time, they "accused [Boyer] of insurance fraud."[2] After discussions with plaintiffs, Travelers agreed to pay to replace the HVAC unit. Notably, it is undisputed that plaintiffs never actually replaced the HVAC unit. Indeed, plaintiffs have not resided in the home since July 2017.

¶ 35     On September 30, 2017, Kimberly Burnell of Travelers wrote to plaintiffs and told them "Travelers' engineer *** inspected your home and determined that the duct work could be cleaned and sanitized." Travelers also stated that it had retained Environmental Initiatives (EI) "to test for bacteria on the floor as well as the walls."

¶ 36     On October 1, 2017, plaintiffs responded to Travelers via e-mail. Plaintiffs stated their belief that, based on information from the City of Lake Forest and the National Weather Service, the sewage backup occurred on July 11 or 12, 2017. They expressed their view that the basement ductwork was contaminated by the sewage because the air conditioning was running before they returned on July 27, 2017. Because the HVAC unit was operating "while sitting in sewage," this

---

[2]The record reflects that plaintiffs alleged several acrimonious interactions with Boyer, who was Pallante's supervisor. In fact, plaintiffs pleaded they suspected that Boyer cut the brake line to the plaintiffs' vehicle on September 19, 2017.

"caused it to splash, mist and blow aerosolized and airborne odors, parasites, bacteria, viruses, fungi and mold through the ductwork." Plaintiffs asserted this contamination was "covered [by Travelers] because the sewage backup was the proximate cause of the damage."

¶ 37    The record reflects that for several weeks after the sewage backup, Travelers paid plaintiffs' costs to reside at a rental residence, pursuant to the policy's coverage for "Additional Living Expenses" (ALE) if a covered loss made the residence unfit to live in. On October 6, 2017, Travelers communicated to plaintiffs that it would authorize two weeks of ALE "pending the result of Environmental Initiatives testing."

¶ 38    On October 6, 2017, Environmental Initiatives inspected the property. In its corresponding report, it concluded that

> "[t]he data suggests that the sanitation of the affected [basement] floor was properly completed and that an abnormal release into the supply ductwork had not occurred.
>
> Analyses of two samples from the return ductwork revealed elevated concentrations of Enterobacteriaceae. This concentration *** is unexpected. Without further testing *** we cannot conclude if these results indicate contamination from the sewage loss ***. Without additional data, we error [*sic*] on the conservative and assume the return ductwork was impacted by the recent sewage release."

¶ 39    On October 25, 2017, Travelers informed plaintiffs that in light of Environmental Initiatives report, it would cover "the cleaning of the ductwork," as well as the replacement of the furnace. Travelers stated the total amount payable for "the building portion of your claim"—

including cost of remediation, cleaning the ductwork, and replacing the furnace—was $37,890.13. In the same letter, Travelers authorized an additional two weeks of ALE, from October 23 to November 5, 2017, to allow time for the furnace to be installed and ductwork cleaned.

¶ 40                                    C. October 31, 2017 Sewage Incident

¶ 41        On November 1, 2017, plaintiffs wrote an e-mail to Doran of HUB: "As we discussed yesterday, we had another incident of raw sewage in the basement." Plaintiffs stated "the amount of sewage was far less this time around." Plaintiffs stated that they could not install a new HVAC system "as long as there is contamination in our basement." Plaintiffs indicated their desire to have someone other than ServPro "sanitize the new damage and to finish remediating the sewage from July (including the sewage ring around the basement walls)."

¶ 42        The record reflects that Travelers was notified about the October 31, 2017, sewage backup. However, plaintiffs did not make an independent claim for coverage from that incident.

¶ 43                          D. Travelers Asserts AC 20's $5,000 Coverage Limitation

¶ 44        On November 8, 2017, Travelers sent plaintiffs a letter, noting that they had not replaced the furnace, despite Travelers' agreement to cover it. Travelers urged plaintiffs to do so immediately.

¶ 45        In the same letter, Travelers acknowledged that plaintiffs had recently told Kim McCline, Travelers' Contents Claim Professional, that they "believe there is mold and/or other microbes present." Travelers stated: "The policy excludes coverage for mold and microbes except as under limited Additional Coverage," reciting AC 20. Travelers wrote: "At this point, we do not have confirmation that the July 10th peril resulted in such fungi or other microbes. However, even if that is the case, the most that could be paid is the $5,000 limit" in AC 20.

¶ 46 In a letter to plaintiffs' counsel, dated November 17, 2017, Travelers denied that it had "required that ServPro be used" for the remediation work. That letter again referenced AC 20 and stated that $5,000 was the most that Travelers would pay for loss from microbes.

¶ 47 The same letter also noted that Travelers was denying plaintiffs' request to pay further "ALE while they remained outside the residence. Travelers noted that it terminated coverage for ALE as of November 5, 2017, because the policy provided ALE only for "the shortest time required to repair or replace the damages" or for the household to "settle elsewhere."

¶ 48 The record reflects that Travelers made payments to plaintiffs of approximately $155,000 in connection with the July 2017 sewage backup. This included $36,824.34 for damage to the dwelling under Coverage A; $96,658.22 for replacement of personal property; and $21,935.12 in ALE.

¶ 49         E. Procedural History

¶ 50 In July 2019, plaintiffs commenced this action by filing a complaint. The original complaint contained claims against Travelers for breach of contract and for liability under section 155 of the Insurance Code. Plaintiffs also alleged a negligence claim against ServPro in connection with its mitigation work, and they pleaded that Travelers was vicariously liable for ServPro's negligence under the doctrine of *respondeat superior*.

¶ 51 In November 2019, plaintiffs filed an amended complaint that added claims against HUB for negligence and breach of fiduciary duty. Plaintiffs also alleged that Travelers and HUB violated the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2018)).

¶ 52 In June 2020, plaintiffs filed a second amended complaint, which added an allegation that ServPro violated the Consumer Fraud Act. It also added a count alleging Travelers' "Breach of Good Faith and Fair Dealing."

¶ 53                1. Dismissal of Consumer Fraud Act Claims With Prejudice

¶ 54        Pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)), Travelers moved for dismissal of plaintiffs' claims based on section 155 of the Insurance Code, the Consumer Fraud Act, and breach of the duty of good faith and fair dealing. In November 2020, the trial court dismissed with prejudice the claim for violation of the Consumer Fraud Act, as well as the claim for breach of good faith and fair dealing. The court declined to dismiss the section 155 claim with prejudice, permitting plaintiffs a "final opportunity" to plead it in a third amended complaint.

¶ 55        HUB separately moved to dismiss the counts corresponding to plaintiffs' claims against it for breach of fiduciary duty, negligence, and violation of the Consumer Fraud Act. In November 2020, the court dismissed the Consumer Fraud Act count against HUB with prejudice. The court dismissed *without* prejudice the counts alleging HUB's breach of fiduciary duty and negligence, permitting plaintiffs to replead those claims in a third amended complaint.

¶ 56                      2. Third Amended Complaint

¶ 57        In December 2020, plaintiffs filed a 95-page third amended complaint, the operative pleading in this action.

¶ 58        The third amended complaint contained a breach of contract claim against Travelers (count I) for failing to provide coverage owed under the policy, as well as a claim for liability under section 155 (count II) related to the coverage dispute. Plaintiffs also pleaded a negligence count against ServPro (count III), as well as a *respondeat superior* claim against Travelers (count IV) under the theory that Travelers was vicariously liable for ServPro's negligence. The third amended complaint also asserted claims against HUB for breach of fiduciary duty (count V), negligence (count VI), and breach of contract (count IX).

¶ 59        In count VII, plaintiffs pleaded that Travelers, HUB, and ServPro violated the Consumer Fraud Act.[3] Count VII pleaded common law fraud against all three defendants. Finally, count X was entitled "Breach of Contract Against ServPro (Alternative Pleading)."

¶ 60        Travelers, ServPro, and HUB subsequently filed motions to dismiss various claims against them.

¶ 61            3. Dismissal of Section 155 and Fraud Claims Against Travelers

¶ 62        Travelers moved to dismiss the third amended complaint's counts alleging liability under section 155 (count II), *respondeat superior* (count IV), and common law fraud (count VIII).

¶ 63        On May 25, 2021, the court dismissed the Section 155 and common law fraud counts with prejudice. Regarding section 155, it reasoned that plaintiffs "have not refuted that a *bona fide* dispute remains" over the scope of applicable insurance coverage.

¶ 64        The court declined to dismiss the *respondeat superior* negligence claim. As a result, the only remaining claims against Travelers were for breach of contract and *respondeat superior*.

¶ 65            4. Dismissal of Certain Claims Against ServPro and HUB

¶ 66        Pursuant to ServPro's motion to dismiss, in May 2021, the court dismissed with prejudice the claims for negligence, violation of the Consumer Fraud Act, and fraud. However, the court declined to dismiss the breach of contract claim against ServPro.

¶ 67        Pursuant to HUB's motion to dismiss, the court entered an order that dismissed the claims against HUB for breach of fiduciary duty, negligence, violation of the Consumer Fraud Act, and common law fraud. The court declined to dismiss the breach of contract count against HUB (count IX).

---

[3]In asserting Consumer Fraud Act claims in the third amended complaint, plaintiffs apparently ignored the court's prior November 2020 dismissal of that claim with prejudice.

¶ 68                                    5. Discovery and Expert Reports

¶ 69          The record reflects the parties engaged in lengthy fact and expert discovery. Several witnesses were deposed, including both plaintiffs, witnesses from the defendants, and expert witnesses.

¶ 70          Plaintiffs submitted an expert witness report from Dr. Eugene Cole, who holds a Master of Science in Public Health Microbiology and a Doctor of Public Health in Biohazard Science and Occupational Health. He opined that ServPro did not adequately remediate the sewage contamination. He offered his opinion that the home was so contaminated from the spread of aerosolized bacteria that the home was not "livable" and required a "total rebuild." At Dr. Cole's deposition, he acknowledged that remediation efforts could have been taken to save the residence.

¶ 71          Plaintiffs also submitted a "Report of Findings and Opinions" by Eric Peterson, J.D., M.B.A, a self-identified "Insurance Expert Witness" with many years of experience in the insurance industry, including as an adjuster and "Litigation Manager."[4] He opined that Travelers breached the policy, violated provisions of the Insurance Code, and "engaged in bad faith." He opined that "the $5000 limit for remediation of the fungi or other microbes" in AC 20 "does not apply to this loss." Peterson also offered his opinions that HUB "breached [its] fiduciary duty," breached an "implied contract" with plaintiffs, and was otherwise negligent.

¶ 72          ServPro retained a rebuttal expert, John Gurtler, the president of Rainbow Restoration of South & West Suburbs. Gurtler opined, *inter alia*, that ServPro conformed to industry standards of the Institute of Inspection Cleaning and Restoration in its work at plaintiffs' home. Gurtler also opined that it would be difficult, if not impossible, to determine whether the current presence of any sewage-related bacteria resulted from the July 2017 incident.

_____

[4]The record reflects that Peterson has a law degree but does not practice law.

¶ 73                    6. Summary Judgment in Favor of HUB, Motion for Reconsideration, and

HUB's Motion for Sanctions

¶ 74        In January 2023, HUB moved for summary judgment on the breach of contract claim, the lone remaining count against it. HUB argued that the record showed the absence of any contract that obligated HUB to advise plaintiffs on their rights under Travelers' policies or oversee Travelers' handling of plaintiffs' claims. In April 2023, the circuit court granted HUB's motion, finding that "no valid and enforceable contract existed between HUB and plaintiffs on which to base a breach of contract claim."

¶ 75        On May 8, 2023, plaintiffs filed a motion for reconsideration. In it, plaintiffs claimed that the court had not considered "expert witness testimony." Specifically, plaintiffs claimed that the opinions in Peterson's report constituted "new evidence" warranting reconsideration of the dismissal of their claims against HUB.

¶ 76        On June 6, 2023 (while the motion to reconsider was pending), HUB filed a motion seeking Rule 137 sanctions against plaintiffs and their counsel for filing a "frivolous" motion for reconsideration. HUB argued that plaintiffs' motion for reconsideration simply repeated their legal arguments and was sanctionable because it attempted to have plaintiffs' expert, Peterson, "invade the province of this Court" to interpret the law.

¶ 77        On July 10, 2023, the court denied HUB's motion for sanctions, without stating its reasoning. On August 10, 2023, the court denied plaintiffs' motion for reconsideration.

¶ 78        In July 2023, ServPro moved to strike plaintiffs' jury demand based upon a jury waiver provision within the authorization for "any and all claims or causes of action" "arising out of or in any way connected to this contract." The court granted that motion and struck the jury demand.

¶ 79          7. Plaintiffs' and Travelers' Cross-Motions for Summary Judgment

¶ 80          On October 17, 2023, plaintiffs moved for partial summary judgment with respect to their breach of contract claim against Travelers (count I). Plaintiffs argued that AC 22 applied to provide full coverage for the loss, which extended to all areas in which "sewage bacteria touched areas of the home," including through the air. Plaintiffs posited that "if the HVAC system had spread sewage bacteria into the ductwork *** it is logical to infer that the HVAC system spread the bacteria through the entire house."

¶ 81          Plaintiffs asserted that testing and expert opinion confirmed the spread of aerosolized sewage-related bacteria throughout the home, "causing direct physical damage to wherever the contaminated air travelled." Thus, plaintiffs urged the court should rule that Travelers was "liable *** for a complete remediation of the house and contents," leaving for trial only the amount of damages.

¶ 82          In the same motion, plaintiffs argued that AC 20 (and the $5,000 limit therein) was inapplicable and did not limit the broader coverage afforded by AC 22. Plaintiffs urged the distinction that AC 22 "provides coverage for the direct physical loss that occurs as a result of the insured event," whereas AC 20 covers "the mold or rot that may occur as a result of the insured event." Plaintiffs argued that in this case, "Everything that the 'water and water-borne material' touched were part of the initial occurrence and were part of the direct physical loss" covered by AC 22. Plaintiffs also urged that Travelers "waived" any reliance on AC 20 because it did not raise it until the November 8, 2017 letter.

¶ 83          On the same date (October 17, 2023), Travelers moved for summary judgment, urging the evidence showed that it did not breach any contractual obligation. Travelers asserted that it fulfilled its duties under the policies because it paid for (1) ServPro's remediation of the sewage water,

(2) the cost of replacing personal property destroyed by the water, and (3) plaintiffs' ALE through November 5, 2017, by which time they should have able to return after the July 2017 backup.

¶ 84    Travelers claimed there was no proof of "unremediated sewage" remaining in the home from the July 2017 event. Travelers also attacked Dr. Cole's opinion that the home must be torn down as an unfounded "presumption." Travelers independently argued that, even assuming the home was no longer salvageable, this was because plaintiffs failed to take proper steps to restore the home.

¶ 85    Travelers otherwise relied on AC 20 as setting a $5,000 limit on any potential additional coverage obligation. It averred that: "Even if the microbes in the sewage water entered the HVAC system and from there aerosolized and spread throughout the house, the costs to remediate such contamination are subject to the $5,000 policy limit for 'Fungi, Other Microbes or Rot Remediation.' "

¶ 86    Travelers also sought summary judgment regarding plaintiffs' *respondent superior* claim because "ServPro was not Travelers' agent." Travelers maintained that plaintiffs "hired ServPro through a written agreement" and that Travelers did not control ServPro's work.

¶ 87        8. The Trial Court Finds Travelers' Liability Is Limited to $5000 Under AC 20

¶ 88    On December 28, 2023, the trial court entered separate orders on Travelers' and plaintiffs' motions for summary judgment. Those orders, in effect, limited Travelers' additional liability to $5,000 pursuant to AC 20.

¶ 89    The court declined to grant Travelers' motion for summary judgment on plaintiffs' breach of contract claim but indicated that any additional coverage owed to plaintiffs would be limited to $5,000 under AC 20:

"The Court finds that the plain language of Travelers insurance policy contains several exclusions and additional coverage, including limitations on damages caused by microbes. The limitation is in the amount of $5,000. The Court finds that Plaintiffs fail to prove any evidence demonstrating that the plain language of the Policy should not apply."

¶ 90    At the same time, the court found there were "questions of fact as to whether plaintiffs can prove that they are entitled to any additional compensation above and beyond what they have already received from Travelers." For example, it noted that while plaintiffs claimed the home needed to be torn down, it was "unclear" whether plaintiffs had contributed to that condition.

¶ 91    The same order granted summary judgment to Travelers with respect to the *respondent superior* claim, noting that plaintiffs "were the ones who signed the contract with Servpro and not Travelers."

¶ 92    In a separate order, the court denied plaintiffs' motion for summary judgment. It noted that "the Policy is clear that it limits damage caused by fungi and bacterial microbes to $5,000 of additional coverage," but there were questions of fact as to whether the claimed damages should be covered.

¶ 93                    9. Summary Judgment in ServPro's Favor

¶ 94    ServPro also filed a motion for summary judgment with respect to plaintiffs' complaint and its counterclaim. On December 28, 2023, the court granted ServPro summary judgment with respect to both (1) plaintiffs' claim for breach of contract in count X of the third amended complaint and (2) ServPro's breach of contract claim in its counterclaim.

¶ 95    In finding in ServPro's favor, the court found that:

"Servpro was hired by Plaintiffs and contracted to perform remediation work for Plaintiffs' property. The Court notes that Plaintiffs provided a Certificate of Satisfaction rating Servpro 10/10 in 5 out of 8 categories and confirmed that all that remained to be done by Servpro was to clean the floor beneath the HVAC system, clean the path up to the stairs and return the dehumidifier equipment. Plaintiffs have not presented any evidence to support their claim of Servpro's failure to train employees or what proper remediation protocols must be followed. Plaintiffs have failed to establish a breach of contract by Servpro."

¶ 96    In granting summary judgment to Servpro on its counterclaim for breach of contract, the court found that "Servpro performed the tasks that it was required to perform" and that "Travelers gave money to plaintiffs to pay ServPro and Plaintiffs chose not to pay them."[5] The court did not assess an award at that time but continued the matter for ServPro to present proof of its damages.

¶ 97                    10. Plaintiffs' Stipulation

¶ 98    On January 12, 2024, plaintiffs filed a "Stipulation to Obtain Final Judgment," in which they recognized that the December 2023 orders effectively limited their potential recovery from Travelers to $5,000 pursuant to AC 20. Because it was not "economical" to proceed to trial for that amount, plaintiffs expressly waived their right to seek such damages and requested the court enter a final judgment.

---

[5]As the court granted summary judgment to ServPro on its breach of contract claim, it declined to address ServPro's *quantum meruit* and unjust enrichment claims.

¶ 99       On January 16, 2024, the court entered judgment in which it recognized that its December 2023 summary judgment orders "act to limit Plaintiffs' damages to the $5000 limit of insurance under Additional Coverage 20" and that plaintiffs waived their right to damages under AC 20.

¶ 100       11. The Trial Court Awards Breach of Contract Damages to ServPro

¶ 101       Pursuant to the order entering summary judgment in ServPro's favor on its counterclaim, ServPro submitted an affidavit and invoices as proof of damages. On February 6, 2024, the court entered judgment in favor of ServPro in the total amount of $40,099.40, consisting of $15,258.01 for the original principal amount of the ServPro invoices, $7,905 for attorney fees and costs, and $16,936,39 in interest.

¶ 102       12. Notice of Appeal and HUB's Cross-Appeal

¶ 103       On February 7, 2024, plaintiffs filed a notice of appeal, challenging, *inter alia*, the trial court's orders on the motions to dismiss and motions for summary judgment.

¶ 104       On February 13, 2024, HUB filed a notice of cross-appeal, which is limited to the trial court's denial of HUB's motion for Rule 137 sanctions.

¶ 105       II. ANALYSIS

¶ 106       On appeal, plaintiffs challenge numerous aspects of the orders granting motions to dismiss and entering summary judgment in favor of each of Travelers, ServPro, and HUB.

¶ 107       "A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint." *Omega Demolition Corp. v. Illinois State Toll Highway Authority*, 2022 IL App (1st) 210158, ¶ 36. The question is whether, even assuming "all well-pleaded facts in the complaint are true, the complaint states a legally recognized cause of action." *Id.*

¶ 108       Summary judgment is proper where—when viewed in the light most favorable to the nonmoving party—the pleadings, depositions, admissions, and affidavits on file reveal that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 30; 735 ILCS 5/2-1005 (West 2024).

¶ 109    *De novo* review applies to both dismissal upon a section 2-615 motion to dismiss and the entry of summary judgment. *Omega Demolition Corp.*, 2022 IL App (1st) 210158, ¶ 36 (*de novo* review applies to a trial court's order granting a section 2-615 dismissal motion); *Illinois Founders Insurance Co.*, 2015 IL App (1st) 122481, ¶ 30 (*de novo* review applies to summary judgment). Under *de novo* review, "[w]e may affirm on any basis in the record, whether or not the trial court relies on that basis or its reasoning was correct." *Omega Demolition Corp.*, 2022 IL App (1st) 210158, ¶ 36.

¶ 110    For organizational purposes, we will first address the plaintiffs' arguments pertaining to Travelers, then the claims against HUB, then claims against ServPro. Finally, we will discuss HUB's cross-appeal.

¶ 111    A. The Court Erred In Finding That AC 20 Limited Travelers' Potential Coverage

Because Plaintiffs May Still Be Able to Prove Coverage Under AC 22

¶ 112    Plaintiffs' primary contention arises from the court's decision on Travelers' motion for summary judgment with respect to plaintiffs' breach of contract claim. Specifically, plaintiffs argue that the court erred in determining that any additional coverage owed was necessarily limited to $5,000 pursuant to AC 20.

¶ 113    Insofar as they claim that sewage from the July 2017 backup was "aerosolized" by the HVAC and spread bacteria throughout their home, plaintiffs dispute that AC 20 and its $5,000 limitation applied. Instead, plaintiffs contend that such loss falls within the scope of AC 22, which allows coverage up to the policy's limits for "direct physical loss" from "water or water-borne

material" that "backs up from a sewer." Plaintiffs assert that AC 20 is inapplicable here and "in no way limits the coverage afforded under" AC 22. Alternatively, plaintiffs argue that Travelers waived the ability to rely on AC 20 because Travelers first mentioned it in a November 8, 2017 letter.

¶ 114    As explained below, we disagree with the trial court, insofar as it found that plaintiffs' right to coverage for all damage from sewage-related bacteria is necessarily limited to $5,000 under AC 20, exclusive of any other provision. Rather, we agree with plaintiffs that sewage microbes may constitute "water-borne" materials that may cause "direct physical loss" covered by the broader coverage in AC 22. Although we recognize that AC 20 limits coverage to $5,000 where a loss "results in" microbes, we do not read AC 20 as necessarily precluding an insured from also getting the broader coverage under AC 22 for "direct physical loss," if it can show that microbes were "water-borne." Plaintiffs have alleged facts potentially implicating the broader coverage under AC 22 and have raised factual issues as to their right to coverage under that provision. Plaintiffs are entitled to further proceedings to explore such factual issues.

¶ 115    "The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *American Economy Insurance Co. v. Holabird & Root*, 382 Ill. App. 3d 1017, 1021-22 (2008). We review *de novo* cases involving summary judgment. *Id.* at 1022.

¶ 116    "The primary function of the court when construing an insurance policy is to ascertain and enforce the intentions of the parties as expressed in the agreement." *Id.* at 1022. A reviewing court " 'must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and

the purposes of the entire contract.' " *Id.* at 1022 (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

¶ 117　　　　A court "must initially look to the language of the policy alone." *Schuster v. Occidental Fire & Casualty Co. of North America*, 2015 IL App (1st) 140718, ¶ 17. "A plain and unambiguous insurance policy is applied as written," and a court "will not search for ambiguity where none exists." *Id.* "However, a policy that is susceptible to more than one reasonable interpretation is ambiguous and subject to rules of interpretation, such as the rule that ambiguities are construed against the drafter of the policy and in favor of coverage." *Id.*

¶ 118　　　　" '[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others.' " *Id.* (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007)).

¶ 119　　　　Notably, in challenging the trial court's interpretation of the policy at issue, plaintiffs do *not* assert any ambiguity in any of its provisions. Rather, they contend that AC 22 applies to give coverage for their claimed damage throughout the home from sewage bacteria that became "aerosolized," notwithstanding the more limited coverage for "microbes" under AC 20.

¶ 120　　　　We again note that AC 22 stated that Travelers would pay (up to policy limits) for "direct physical loss" to the residence "caused by water or water-borne material," including that which "[e]nters through or backs up from a sewer or drain." There is no dispute that sewage backed up at plaintiffs' residence, but the parties disagree on the precise scope of "water-borne material." Notably, plaintiffs pleaded in the third amended complaint that AC 22 applied because, *inter alia*, bacteria in sewage comprises "water-borne" material.

¶ 121　　　　Travelers did not dispute that it owed coverage for areas of the home coming into direct contact with sewage water (primarily the basement); indeed, the record shows that Travelers paid

funds for such remediation. However, insofar as plaintiffs claim damage from sewage-related bacteria, Travelers relied on the limitation in AC 20. That clause provided coverage for "a loss caused by a Peril Insured Against result[ing] in 'fungi,' other microbes or rot," including "remediation" of such microbes, but subject to a $5,000 coverage limit.

¶ 122　　　　We emphasize that the precise coverage question is not about property that came into direct contact with sewage; it only concerns coverage for additional property damage by bacteria or other microbes from sewage that were aerosolized and spread through the home. There is no dispute that bacteria are microbes. Yet, according to plaintiffs, AC 20 is "inapplicable" to their claim for coverage under AC 22. That is, they argue that AC 20 does not serve to undermine coverage otherwise available under AC 22 for a direct physical loss from water-borne materials. Plaintiffs emphasize that AC 22 sets forth coverage up to policy limits for a "direct physical loss" from water-borne materials, whereas AC 20 provides limited coverage where a peril "results in" microbes.

¶ 123　　　　Travelers concedes that AC 22 extends to cover direct physical loss from "water and water-borne material," *i.e.*, portions of the home directly contacted by liquid sewage. Travelers does not dispute that microbes in sewage could constitute "water-borne" material, as that phrase is used in AC 22. However, insofar as plaintiffs seek coverage for subsequent damage from aerosolized microbes, Travelers urges the claim is limited by AC 20. That is, Travelers' position is that coverage for damage from "airborne" microbial contamination must be limited to $5000, as was determined by the trial court.

¶ 124　　　　After scrutinizing the policy provisions, the third amended complaint's allegations, and the parties' arguments, we agree with plaintiffs that the trial court erred, insofar as it found that plaintiffs' claim was necessarily limited by AC 20, such that plaintiffs were foreclosed from

seeking coverage under AC 22 for sewage-related microbial contamination. Rather, we think plaintiffs have alleged and raised factual issues as to whether they suffered a direct physical loss from "water-borne material" that is covered under AC 22.

¶ 125    In making this determination, we agree with plaintiffs that the coverage limit in AC 20, where an insured loss "results in" microbes, does not automatically preclude application of the broader coverage under AC 22 for a "direct physical loss" from "water-borne material" after a sewage backup. Certainly, Travelers (as drafter) could have crafted AC 20 so as to explicitly state that it limited application of AC 22, but it did not do so. There is nothing on the face of the policy to compel the conclusion that AC 20 necessarily supersedes or precludes coverage under AC 22, if an insured can demonstrate a "direct physical loss" from microbes as "water-borne material" within the meaning of AC 22.

¶ 126    By the same measure, we note that Travelers could have defined the term "water-borne material" in AC 22 to specifically exclude bacteria or other microbes. Had it done so, it is hard to see how plaintiffs could maintain the current claim for coverage. Instead, in AC 22, Travelers elected to provide coverage up to policy limits for direct physical loss "caused by water *or water-borne material*" that "backs up from a sewer." There is no dispute that sewage bacteria can fall within the scope of "water-borne material."

¶ 127    We recognize Travelers' position that, insofar as plaintiffs allege "aerosolized" sewage bacteria, it was no longer "water-borne" and, thus, could not implicate coverage under AC 22. That is, Travelers argues there is a "demarcation" point such that coverage ended when "bacteria and other microbes in the sewage water became airborne." On the other hand, plaintiffs have alleged that sewage droplets or "mist" was spread through their home. Arguably, microbes in droplets or mist might still be considered "water-borne."

¶ 128    In any event, we need not attempt to define a precise demarcation between "water-borne" and airborne microbes. Nor do we purport to decide, as a factual matter, whether some or all of the bacterial contamination in plaintiffs' home was from "water-borne" material. On remand, the parties can adduce evidence, including expert opinion, to be considered by the fact-finder in deciding such questions. We simply determine that plaintiffs have adequately alleged and raised one or more issues of fact as to whether they are entitled to any additional coverage under AC 22, notwithstanding the separate limitation in AC 20. Plaintiffs should be afforded an opportunity to prove their coverage claim in further proceedings.

¶ 129    Accordingly, we reverse the trial court's order upon Travelers and plaintiff's cross-motions for summary judgment on plaintiffs' breach of contract claim, insofar as it determined that AC 20 limited any additional coverage liability to $5,000. We remand for further proceedings on that claim. We note that, just as a factfinder may ultimately consider whether plaintiffs can actually prove any damages from "water-borne" microbes within the meaning of AC 22, a factfinder may also consider defenses to coverage, such as plaintiffs' alleged failure to mitigate damages.

¶ 130    In light of the foregoing analysis, we need not delve into plaintiffs' alternative argument that Travelers waived reliance on AC 20 and the $5,000 coverage limitation therein. That is, we have determined that plaintiffs may still seek coverage under AC 22, notwithstanding AC 20. In any event, we note that "[w]aiver consists of an express or implied voluntary and intentional relinquishment of a known right." *Illinois Insurance Guaranty Fund v. Nwidor*, 2018 IL App (1st) 171378, ¶ 21. The record does not show any voluntary and intentional relinquishment by Travelers of its right to rely on AC 20.

¶ 131                    B. Preclusion of Plaintiffs' Expert Eric Peterson

¶ 132          Before we conclude our discussion of the coverage dispute, we acknowledge that plaintiffs' brief contends (within a single paragraph) that the court erred in barring plaintiffs' "insurance adjustment expert," Eric Peterson. Plaintiffs assert that the court erroneously barred Peterson merely because "he was not currently licensed in Illinois as an insurance broker or attorney" and that the court "miscategorized Mr. Peterson's testimony and qualifications."

¶ 133          Notably, plaintiffs' brief does not provide any supporting citations to the record or legal authority. Thus, this particular claim of error is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (the argument in an appellant's brief "shall contain the contentions of the appellant and the reasons therefore, with citation of the authorities and the pages of the record relied on"). "A failure to cite relevant authority violates Rule 341 and can cause a party to forfeit consideration of the issue." *Kic v. Biannuci*, 2011 IL App (1st) 100622, ¶ 23; see also *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 ("Where an appellant has failed to support his or her arguments with citations to authority, this court will not research the issues on the appellant's behalf.").

¶ 134          C.  The Section 155 Claim Against Travelers Was Properly Dismissed Because There

Is A *Bona Fide* Coverage Dispute

¶ 135          We turn to plaintiffs' separate claim that the court erred in dismissing the third amended complaint's count against Travelers premised on section 155 of the Insurance Code. 215 ILCS 5/155 (West 2022). Notwithstanding our preceding analysis that plaintiffs should be able to maintain their underlying claim for coverage, we agree with the trial court's decision to dismiss the plaintiffs' count seeking section 155 relief. As the trial court recognized, there was obviously a *bona fide* dispute as to coverage that precludes liability under section 155.

¶ 136          Section 155 provides:

"In any action by or against a company where there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $60,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of cost, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." 215 ILCS 5/155 (West 2022).

¶ 137    Section 155 does not create an independent tort for which an insurance company can be held liable. *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 523-27 (1996). Instead, it "presupposes an action on the policy" and "simply provides an extracontractual remedy to an action on a policy." *Id.* at 523.

¶ 138    "The key question in a section 155 claim is whether an insurer's conduct is vexatious and unreasonable." *Nine Group, II, LLC v. Liberty International Underwriters, Inc.*, 2020 IL App (1st) 190320, ¶ 41. Significantly, "[s]ection 155 costs and sanctions are inappropriate when a *bona fide* dispute regarding coverage exists." *Id.* ¶ 44. "A *bona fide* dispute is one that is real, actual, genuine, and not feigned." (Internal quotation marks omitted.) *Illinois Founders Insurance Co.*,

2015 IL App (1st) 122481, ¶ 32. Where an insurer reasonably relies upon evidence sufficient to form a *bona fide* dispute, that insurer has not acted unreasonably or vexatiously. *Id.*

¶ 139    In this case, the record unquestionably shows that Travelers and plaintiffs had an actual, genuine dispute as to the scope of coverage. As illustrated by the foregoing analysis, the parties had a genuine, complex, *bona fide* dispute as to applicable coverage for plaintiffs' claim of damage to the home from aerosolized bacteria resulting from the sewage backup. Specifically, the parties' arguments as to whether AC 20 or AC 22 governed this type of alleged property damage show a legitimate coverage dispute argued in good faith. This precludes a finding that Travelers acted unreasonably or vexatiously for purposes of section 155. See *id.* ¶ 33 (to prevail on a section 155 claim, insurer is only required to show a *bona fide* dispute).

¶ 140    Accordingly, we affirm the dismissal of plaintiffs' claim against Travelers pursuant to section 155.

¶ 141    D. The Court Properly Granted Summary Judgment to Travelers on Plaintiffs'

*Respondeat Superior* Claim

¶ 142    Plaintiffs appeal the dismissal of their *respondeat superior* claim against Travelers (count IV), yet they devote less than a paragraph of their opening brief to it. They state (without any citations to the record) that their deposition testimony and e-mails "evidence that they understood that Travelers had hired Servpro, and there are triable issues of fact as to whether Travelers was, in fact, in charge of and responsible for Servpro's hiring and oversight."

¶ 143    Insofar as plaintiffs fail to cite any caselaw or record citations, we find this point is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument within an appellant's brief shall contain "citation of the authorities and the pages of the record relied on" and "[p]oints not argued

are forfeited and shall not be raised in the reply brief, in oral argument or on petition for rehearing").

¶ 144    Even without forfeiture, we would otherwise affirm entry of summary judgment on the *respondeat superior* claim against Travelers because plaintiffs failed to identify any evidence that Travelers had the requisite control over ServPro. The *respondeat superior* doctrine allows an injured party to hold a principal vicariously liable for the conduct of its agent. *McNerney v. Allamuradov*, 2017 IL App (1st) 153515, ¶ 67.

> "Proof of actual agency, or *respondeat superior*, requires a showing that (1) a principal/agent, master/servant, or employer/employee relationship existed; (2) the principal controlled or had the right to control the conduct of the alleged employee or agent; and (3) the alleged conduct of the agent or employee fell within the scope of the agency or employment." *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18.

¶ 145    As to the first element, the evidence does not show the requisite principal/agent relationship between Travelers and ServPro. Indeed, e-mails show that it was HUB (not Travelers) who contacted ServPro shortly after discovery of the July 2017 sewer backup. Further, when ServPro arrived at plaintiffs' residence, plaintiffs signed an authorization that stated that "Provider [ServPro] is working for the Customer and not Customer's Insurance Company." Notwithstanding plaintiffs' claim they signed under duress, nothing in the authorization suggests any principal/agent relationship between Travelers and ServPro.

¶ 146    Moreover, plaintiffs point to no evidence suggesting that Travelers controlled or had the right to control ServPro's work at plaintiffs' property. See *McNerney*, 2017 IL App (1st) 153515, ¶ 70 ("the right to control the manner in which the work is performed is considered to be the most important factor" in determining the existence of an agency relationship). The lack of evidence

that Travelers controlled ServPro's work is fatal to plaintiffs' *respondeat superior* claim against Travelers. We thus affirm the entry of summary judgment as to this claim.

¶ 147          E. The Consumer Fraud Act Claim Against Travelers Was Properly Dismissed

¶ 148          We turn to address the dismissal of plaintiffs' Consumer Fraud Act claim (count VII) against Travelers. The trial court dismissed this claim on two grounds: (1) the Consumer Fraud Act claim was preempted insofar as it duplicated claims for breach of contract or section 155 and (2) even if the "claim for consumer fraud was not preempted," plaintiff failed to plead the elements of a claim under the Consumer Fraud Act.

¶ 149          "The Consumer Fraud Act protects 'consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.' " (Internal quotation marks omitted.) *Ash v. PSP Distribution, LLC*, 2023 IL App (1st) 220151, ¶ 23. The Consumer Fraud Act defines deceptive acts or practices as

> "including but not limited to the use or employment of any deception, fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact *** in the conduct of any trade or commerce." 815 ILCS 505/2 (West 2024).

¶ 150          "Under the Consumer Fraud Act, the plaintiff must allege (i) the defendant engaged in a deceptive act or practice, (ii) intending that the plaintiff rely on the deception or practice, (iii) which occurs in the course of conduct involving trade or commerce, (iv) causing actual damage to the plaintiff, (v) proximately caused by the deception." *Ash*, 2023 IL App (1st) 220151, ¶ 23. " 'Intent under the Consumer Fraud Act means that the defendant intended for the plaintiff to rely on the deception as opposed to the defendant's intent to deceive.' " *Id.* ¶ 26.

¶ 151    To assert a claim under the Consumer Fraud Act, the complaint "must state with particularity and specificity the deceptive [unfair] manner of defendant's act or practices, and the failure to make such averments requires the dismissal of the complaint." (Internal quotation marks omitted.) *Phillips v. DePaul University*, 2014 IL App (1st) 122817, ¶ 32. An alleged violation of the Consumer Fraud Act must be pled with the same particularity and specificity as that required under common law fraud. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501 (1996). However, unlike common law fraud, plaintiffs need not show actual reliance under the Consumer Fraud Act. *Ash*, 2023 IL App (1st) 220151, ¶ 27.

¶ 152    Count VII of the third amended complaint (which spanned 18 pages) purported to describe numerous deceptive practices by each of Travelers, HUB, and ServPro. Those claims related to the circumstances that led to ServPro beginning work at plaintiffs' home, ServPro's allegedly deficient performance of the work, the handling of plaintiffs' insurance claims, and Travelers' communications to plaintiffs about the extent of coverage.

¶ 153    The allegations directed to Travelers boiled down to (1) claims that Travelers' agent, Pallante, made false statements about the need for ServPro to begin work on or about July 29, 2017; and (2) claims that Travelers subsequently "misrepresented" the amount of coverage under the policy for damage to their property.

¶ 154    Regarding the events of July 29, 2017, plaintiffs alleged that Doran of HUB and Moriarty and Graf of ServPro "represented that Plaintiffs' insurance policy required that Plaintiffs use ServPro's services" to mitigate damage to their home, and that Pallante "misled them as to whether they needed to immediately authorize ServPro into their home to remediate the sewage damage."

¶ 155    Plaintiffs also alleged that Travelers and HUB "fail[ed] to disclose the need for Plaintiffs to file a proof of loss" and told plaintiffs that they did not need to fill out any other paperwork.

Plaintiffs also alleged that Travelers "misrepresent[ed] the nature of the policy" by telling plaintiffs that it did not provide "coverage related to the sewage mist dispersed through Plaintiffs' home" and by communicating to plaintiffs that coverage for "microbial damage" was limited to $5,000, pursuant to AC 20. Plaintiffs alleged that "Travelers misrepresented" that the policy "did not cover their damage to the upstairs and to all of their possessions in their home." Plaintiffs allege that Kim Burnell of Travelers "denied coverage for the upstairs on the deceptive basis that Plaintiffs' insurance policy did not provide coverage for the damage." Plaintiffs otherwise alleged that Travelers' "contents specialist," Kim McCline, did not approve sufficient coverage to compensate plaintiffs for the damaged personal property.

¶ 156      We again note that the trial court dismissed for two reasons: (1) preemption and (2) failure to state a claim. We agree that, insofar as count VII was premised on Travelers' "misrepresentations" as to the extent of coverage, liability under Consumer Fraud Act was preempted.

¶ 157      We recognize that an insurer's conduct "may give rise to both a breach of contract action and a separate and independent tort action." *Cook ex rel. Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 31. However, "mere allegations of bad faith or unreasonable and vexatious conduct *** do not constitute such a tort. Courts therefore should look beyond the legal theory asserted to the conduct forming the basis for the claim." *Id.*

¶ 158      When an insurer's alleged conduct "is merely a breach of contract or conduct proscribed by section 155, a Consumer Fraud Act on that claim is preempted by section 155." *Id.* (citing *Young v. Allstate Insurance Co.*, 351 Ill. App. 3d 151, 169 (2004)). "A consumer fraud claim may not be based on a breach of a promise contained in the insurance policy." *Burress-Taylor v.*

*American Security Insurance Co.*, 2012 IL App (1st) 110554, ¶ 29 (finding that plaintiffs properly raised an independent fraud claim).

¶ 159     We concur with the trial court that preemption applied here, insofar as the Consumer Fraud Act claim against Travelers essentially duplicated the breach of contract and section 155 counts. Most, if not all, of count VII's allegations about Travelers were based on either (1) Travelers' interference with plaintiffs' rights under the policy to select their own remediation company or (2) Travelers' failure to provide coverage that plaintiffs claimed was owed under the policy. That is, the basis of the allegations in count VII were not substantially different from the claims of breach of contract and section 155 liability. Under the precedent cited above, we agree with the trial court that count VII was preempted.

¶ 160     In any event, even assuming *arguendo* that preemption did not apply, we otherwise agree with the trial court that plaintiffs did not adequately plead the elements of a claim under the Consumer Fraud Act.

> "[T]he plaintiff must allege (i) the defendant engaged in a deceptive act or practice, (ii) intending that the plaintiff rely on the deception or practice, (iii) which occurs in the course of conduct involving trade or commerce, (iv) causing actual damage to the plaintiff, (v) proximately caused by the deception." *Ash*, 2023 IL App (1st) 220151, ¶ 23.

¶ 161     Insofar as the claim is premised on the circumstances by which ServPro arrived and presented documents for plaintiffs to sign before beginning work, we do not find sufficiently specific allegations in count VII that *Travelers* made false statements, with the intent that the plaintiffs rely on the deception, or that Travelers proximately caused resulting damages. Rather, close scrutiny shows these claims are directed at *ServPro*'s conduct, statements, and documents. Count VII alleges that Graf from Servpro "knowingly or recklessly falsely told" plaintiffs that

"they would be deemed uncooperative" if they prevented ServPro from immediately starting work and that Pallante of Travelers "knowingly or recklessly agreed" with Graf. Similarly, count VII alleges that Pallante "knowingly or recklessly" misstated the "nature of the three documents *that ServPro required the Schaffs to sign* without sufficient time to review them." (Emphasis added).[6] We do not see how Travelers can be held liable under the Consumer Fraud Act for documents from ServPro that "ServPro required" plaintiffs to sign. Similarly, count VII does not specify how Travelers' alleged statements surrounding the retention of ServPro proximately caused plaintiffs' damages.

¶ 162    The remainder of count VII's allegations against Travelers amount to claims that Travelers wrongfully denied the extent of coverage requested or otherwise failed to comply with the terms of the policies. However, a mere breach of a contractual promise is not a basis for a consumer fraud claim. *Burress-Taylor*, 2012 IL App (1st) 110554, ¶ 29.

¶ 163    For these reasons, we affirm the dismissal of count VII insofar as it was directed against Travelers.

¶ 164    This concludes our discussion of the plaintiffs' claims against Travelers. We reverse only the challenged order regarding plaintiffs' breach of contract claim and remand for further proceedings on that claim. We otherwise affirm the dismissal of the counts asserting claims against Travelers under section 155, the *respondeat superior* doctrine, and the Consumer Fraud Act.

¶ 165        F. The Consumer Fraud Act Claim Against HUB Was Properly Dismissed

¶ 166    We will now turn to plaintiffs' claims of error with respect to HUB, plaintiff's insurance agent. Plaintiffs appeal the dismissal of their Consumer Fraud Act, breach of fiduciary duty, and

---

[6]Notably, count VII states that plaintiffs "only complaint" about Travelers adjuster Pallante is that he "misled them as to whether they needed to immediately authorize ServPro into their home" but that Pallante "was otherwise helpful to the Schaffs in processing their claim."

negligence claims against HUB.[7] For the following reasons, we affirm the dismissal of those claims.

¶ 167     Insofar as the Consumer Fraud Act count (count VII) was directed to HUB, plaintiffs alleged that when they called Doran on the night of July 27, 2017, "Doran told Plaintiffs that Travelers would be sending people out the next day" to assess the damage "and that Plaintiffs had to allow them to do to so in order to comply with the provision of their insurance policy." On July 28, 2017, HUB informed plaintiffs that they needed to go to their home to meet ServPro. On July 29, 2017, when ServPro arrived and told plaintiffs that they had to use ServPro to maintain coverage, HUB "knowingly or reckless falsely agreed with ServPro."

¶ 168     Count VII also alleged that HUB "fail[ed] to disclose the need for Plaintiffs to file a proof of loss" and that when plaintiffs asked if they needed to file paperwork, "Doran said that his office was taking care of everything."

¶ 169     We do not find that count VII adequately pleaded the elements of a claim under the Consumer Fraud Act, with respect to either (1) requisite knowledge of any false statement or (2) proximate causation.

¶ 170     As emphasized by HUB, the Consumer Fraud Act specifies that to be held liable, insurance agents must have "actual knowledge" of a falsity concerning the terms of an insurance policy. 815 ILCS 505/10b(6) (West 2024). Specifically, section 10b(6) states that the Act does not apply to:

> "The communication of any false, misleading, or deceptive
>
> information by an insurance producer *** or by an insurance agency
>
> *** concerning the sale, placement, procurement, renewal, binding,

---

[7]Plaintiffs do not raise any argument challenging the dismissal of their fraud or breach of contract claims against HUB.

cancellation of or terms of any type of insurance or any policy of insurance *unless the insurance producer has actual knowledge of the false, misleading, or deceptive character of the information.* This provision shall be effective as to any communications, whenever occurring." (Emphasis added.) *Id.*

¶ 171    The allegations against HUB in count VII do not survive this standard. At no point in count VII do plaintiffs unequivocally allege that HUB had actual knowledge that any statement made to plaintiffs was false or misleading. Indeed, it does not specify any particular false statement knowingly made by HUB. At most, plaintiffs alleged that HUB "knowingly *or recklessly* falsely agreed" with ServPro's statements to plaintiffs.

¶ 172    Moreover, we do not find that count VII sufficiently alleges any damages proximately caused by HUB. "Proximate causation is an element of all private causes of action under the [Consumer Fraud] Act." *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 199 (2005). A plaintiff "must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation." *Id.* Although count VII alleged that HUB "agreed" with false statements *made by ServPro*, it did not allege how HUB (rather than ServPro) deceived plaintiffs and proximately caused their damages. Further, plaintiffs did not sufficiently articulate injuries proximately caused by HUB's alleged failure to advise plaintiff to "file a proof of loss" or other paperwork.

¶ 173    G. The Court Properly Dismissed the Breach of Fiduciary Duty Claim Against HUB

¶ 174    We turn to plaintiffs' challenge to the section 2-615 dismissal of their claim for breach of fiduciary duty against HUB (count V).

¶ 175    In that count, plaintiffs alleged that HUB, as their insurance agent, had a duty "to perform services with skill, diligence and loyalty." They alleged that HUB (through Doran) breached its fiduciary duty through actions and statements made after the July 2017 sewage backup. Among these, plaintiffs allege that HUB failed to inform them that they could choose which company performed the remediation work; told them that "Travelers would send the appropriate people and that [plaintiffs] needed to cooperate" to maintain coverage; "fil[ed] a claim with Travelers that understated the damage" to the home; and failed to file a claim under the Personal Articles Policy for damaged personal property.

¶ 176    In dismissing this count, the court agreed with HUB that this claim was precluded by section 2-2201 of the Code (735 ILCS 5/2-2201 (West 2024)), insofar as that provision "removed the common law fiduciary standard applicable to an insurance producer and require[s] an insurance producer to exercise only ordinary care." The court otherwise found that, "even assuming that HUB did have a fiduciary duty," plaintiffs had not "sufficiently established that the alleged breaches caused their damages."

¶ 177    Our precedent confirms the trial court's conclusion that section 2-2201 of the Code barred this claim and warranted dismissal.

¶ 178    To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom. *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 17. The question of whether a fiduciary duty is owed is a question of law reviewed *de novo*. See *Van Dyke v. White*, 2019 IL 121452, ¶ 68 (whether an investment adviser owes a fiduciary duty is a question of law); *231 W. Scott, LLC v. Lakeside Bank*, 2017 IL App (1st) 161131, ¶ 30 (scope of fiduciary duty is a question of law).

¶ 179       This court has explained:

> "Historically, insurance brokers owed a fiduciary duty to the insured, while insurance agents owed a fiduciary duty to the insurer. [Citation.] However, in 1997, the Illinois legislature enacted Public Act 89-638 *** which added section 2-2201 to the Code. See Pub. Act 8-638, § 5 (eff. Jan. 1, 1997) (adding 735 ILCS 5/2-2201)." *Austin Highlands Development Co. v. Midwest Insurance Agency, Inc.*, 2020 IL App (1st) 191125, ¶ 13.

¶ 180       Section 2-2201(a) provides that an "insurance producer *** shall exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by the insured or proposed insured." 735 ILCS 5/2-2201(a) (West 2024). Significantly, our supreme court has stated that "[t]he duty of ordinary care imposed in subsection (a) is not based on a fiduciary relationship between an insurance producer and the insured." *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 25.

¶ 181       Section 2-2201(b) states:

> "No cause of action brought by any person or entity against any insurance producer *** concerning the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance shall subject the insurance producer *** to civil liability under standards governing the conduct of a fiduciary or a fiduciary relationship except when the conduct upon which the cause of action is based involves the wrongful retention or misappropriation by the insurance producer *** of any money that was received as premiums, as a premium deposit, or as payment of a claim." 735 ILCS 5/2-2201(b) (West 2024).

¶ 182        Thus, section 2-2201 " 'prevents any insurance producer from being held to the fiduciary standard, except in a narrow set of circumstances' [citation], *i.e.*, those involving the appropriation of money." *Austin Highlands Development Co.*, 2020 IL App (1st) 191125, ¶ 13 (quoting *American Family Mutual Insurance Co. v. Krop*, 2018 IL 122556, ¶ 28). In other words, "section 2-2201 of the Code has removed the common law fiduciary duty standard applicable to an 'insurance producer' and required an 'insurance producer' to exercise only ordinary care." *Id.*

¶ 183        There is no dispute that HUB is an insurance "producer" within the meaning of section 2-2201. Indeed, "our supreme court has concluded that anyone who is required to be licensed to sell, solicit, or negotiate insurance, including both agents and brokers, are considered insurance producers." *Id.* ¶ 14 (citing *Skaperdas*, 2015 IL 117021, ¶¶ 29, 43). Yet, plaintiffs assert that section 2-2201 does not bar their breach of fiduciary duty claim against HUB because they "are not alleging a breach of fiduciary duty with respect to renewing, procuring, binding or placing the coverage." That is, plaintiffs urge they can maintain their breach of fiduciary duty claim despite section 2-2201 because the alleged breaches are premised on HUB's statements and acts "subsequent to obtaining coverage" and "HUB's handling of the claim at issue."

¶ 184        However, plaintiffs fail to cite any authority suggesting that section 2-2201 does not apply to bar a breach of fiduciary duty claim premised on an agent's statements with respect to handling a claim. This is not surprising, as our supreme court explicitly held that section 2-2201 "prevents any insurance producer from being held to the fiduciary standard, except in a narrow set of circumstances ***. 735 ILCS 5/2-2201(b) (West 2014). Instead insurance producers have only a general duty to exercise ordinary care." *Krop*, 2018 IL 122556, ¶ 28.

¶ 185        Plaintiffs' allegations against HUB do not fall within the narrow circumstances under which section 2-2201(b) permits a claim for breach of fiduciary duty against an insurance

producer; there is no allegation of HUB's "wrongful retention or misappropriation" of money. 735 ILCS 5/2-2201(b) (West 2024). Accordingly, the trial court correctly determined that section 2-2201 barred plaintiffs from maintaining a claim for breach of fiduciary duty against HUB.

For this reason, we affirm the dismissal of this claim against HUB.

¶ 186        H. The Negligence Claim Against HUB Was Properly Dismissed

¶ 187        We turn to plaintiffs' challenge to the dismissal of their negligence claim against HUB, (count VI). In that count, plaintiffs alleged that HUB, as their insurance agent, "owed them a duty to truthfully explain and guide them in their claims against Travelers."

¶ 188        Plaintiffs alleged that HUB breached its duty by not telling them "that they could select a firm to remediate their home" but instead telling them that Travelers "would send the appropriate people and they needed to cooperate." HUB also allegedly "should have known" that ServPro was a "preferred or approved vendor of Travelers" but failed to disclose this to plaintiffs. Plaintiffs further pleaded that HUB was negligent by "filing a claim with Travelers that understated the damage" to their home and by failing to file a claim under the Personal Articles Policy. HUB also allegedly failed to advise plaintiffs "to file a proof of loss" and failed to correct Travelers' mishandling of their claim. Plaintiffs pleaded that Travelers "managed the claim as though the home had only been damaged by plain water" but "HUB did not ensure that the mistake was corrected and that Travelers appropriately coverage [*sic*] for the claim." Plaintiffs alleged that, as a result, they "suffered property damage and have suffered the loss of use of the Insured Property."

¶ 189        "To state a cause for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." (Internal quotation marks omitted.) *Simpkins v. CSX*

*Transportation, Inc.*, 2012 IL 110662, ¶ 14. Whether a duty exists in a particular case is a question of law. *Id.*

¶ 190    In challenging dismissal of this count, plaintiffs aver (without any supporting case law) that HUB "owed them a duty to truthfully explain and guide them in their claim." Plaintiffs then essentially reassert the third amended complaint's allegations as to how HUB breached that purported duty. Plaintiffs argue that the element of proximate causation is satisfied because, "but for" HUB's alleged failures, plaintiffs would have hired someone besides ServPro for the remediation work and plaintiffs "would have filed the proper documentation."

¶ 191    In its response brief, HUB points out that plaintiffs do not cite any case law to show "that HUB owed them a common-law duty beyond the issuance of the subject policies."

¶ 192    We affirm dismissal because we do not find that plaintiffs pleaded a breach of a duty owed to them by HUB or proximate causation. As to the element of duty, we reject the unsupported suggestion that HUB, in its role as insurance agent, somehow owed a duty to plaintiffs to monitor or correct how Travelers handled plaintiffs' claims.

¶ 193    The "touchstone" of a "duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." (Emphasis and internal quotation marks omitted.) *Id.* ¶ 18. As HUB points out, plaintiffs do not articulate why HUB owed plaintiffs any duty "beyond the issuance of the subject policies."

¶ 194    Although HUB may have helped plaintiffs procure the Travelers policies before the July 2017 incident, plaintiffs do not allege facts or cite case law suggesting that HUB owed plaintiffs *subsequent* duties to assist them in filing claims on those policies. Nor do plaintiffs articulate a

basis to find that HUB owed a duty to monitor or "correct" Travelers' responses or coverage decisions. The lack of the duty element independently warranted dismissal of this claim.

¶ 195    Similarly, we do not find that plaintiffs adequately alleged that HUB's actions were a proximate cause of any harm that they suffered. Plaintiffs' brief does not cite any legal authority on the proximate cause element, yet they urge that "but for" HUB's failures, the home would have been properly remediated. However, merely claiming "but for" causation is not equivalent to adequately alleging proximate cause. Proximate cause "embodies two distinct concepts: cause in fact and legal cause." *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. The "but for" test relates to cause in fact. *Id.* ("Under the 'but for' test, a defendant's conduct is not the cause of an event if the event would have occurred without it." (Internal quotation marks omitted.)). Yet, proximate cause also requires "legal cause," which "involves an assessment of foreseeability." See *id.* ¶ 24. Legal cause " 'is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it.' " *Id.* (quoting *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004)).

¶ 196    Here, we do not find that HUB's conduct was so "closely tied" to plaintiffs' damages to conclude that HUB was a proximate cause, not merely a "but for" cause, of plaintiffs' injuries. In count VI, plaintiffs essentially asked that HUB be held liable for failing to prevent injuries *directly caused by other parties*—namely, Travelers and ServPro. Just as we find no basis to impose a duty on HUB to monitor those other parties, we do not find that plaintiffs adequately alleged HUB was a proximate cause of alleged injuries more directly caused by ServPro and Travelers.

¶ 197    For these reasons, we affirm the dismissal of count VI for negligence against HUB. We have thus affirmed each of plaintiffs' claims of error with respect to HUB. We now turn to plaintiffs' arguments regarding ServPro.

¶ 198        I. Plaintiffs Adequately Alleged a Consumer Fraud Claim Against ServPro

¶ 199        Although we have found that plaintiffs' Consumer Fraud Act claims against Travelers and HUB were properly dismissed, we reach a different result regarding claims directed to ServPro. We find count VII sufficiently alleged that ServPro made one or more deceptive statements or acts falling within the scope of the Consumer Fraud Act and that plaintiffs were proximately injured as a result.

¶ 200        As discussed *supra*, count VII included allegations that on July 29, 2017, ServPro falsely told plaintiffs that they needed to allow ServPro to begin work immediately or "they would be deemed uncooperative" and risk losing insurance coverage. Further, plaintiffs alleged that ServPro "misrepresented the purpose, scope and nature of the three documents that ServPro required the Schaffs to sign without sufficient time to review them." Plaintiffs specifically alleged that ServPro told them that the documents presented to them on an iPad were "not contracts" but merely gave ServPro "permission to work on the property, to return equipment, and to be paid by Travelers."

¶ 201        Plaintiffs alleged that ServPro intended that plaintiffs rely on such misrepresentations and that plaintiffs did rely on them. Elsewhere in count VII, plaintiffs alleged that they suffered damages by ServPro's acts or omissions, including inadequate remediation work and failure to properly account for valuable items of plaintiffs' personal property.

¶ 202        We keep in mind that upon review of a section 2-615 dismissal, we accept all well-pleaded facts and reasonable inferences as true. *Ash*, 2023 IL App (1st) 220151, ¶ 18. Further, "[c]ourts liberally construe the Consumer Fraud Act to effectuate its purposes." *Id.* ¶ 23. We find that plaintiffs sufficiently alleged specific misrepresentations by ServPro that fell within the scope of deceptive acts prohibited by the Consumer Fraud Act. Plaintiffs have detailed specific false statements by ServPro that allegedly pressured plaintiffs to hire ServPro on the spot and caused

them to sign documents without reading them. Regardless of whether these allegations are ultimately proven to be true, they are sufficient to withstand a motion to dismiss. We also find that plaintiffs sufficiently alleged damages proximately caused by such representations, insofar as the third amended complaint indicates that, but for the false representations from ServPro, plaintiffs would have hired a different company to perform the remediation work. Thus, we reverse the dismissal of count VII with respect to ServPro.

¶ 203    J. The Negligence Claim Against ServPro Was Not Barred by the *Moorman* Doctrine

¶ 204    We turn to plaintiffs' claim that the trial court erred in the May 2021 order when it dismissed its negligence claim against ServPro (count III). In so doing, the court noted the *Moorman* doctrine and found that plaintiffs' "claims[s] for negligence and breach of contract cannot stand together."

¶ 205    The court dismissed this count pursuant to section 2-619(a)(9) of the Code, which permits a defendant to seek dismissal because the claim "is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2022). Such a motion admits the legal sufficiency of the complaint but asserts an affirmative matter outside the complaint that defeats the cause of action. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). We review such a dismissal *de novo*. *Id.*

¶ 206    Plaintiffs' negligence count against ServPro pleaded that ServPro breached its duty to use reasonable care during its mitigation work through various acts and omissions, including failing to follow proper mitigation protocols, failing to fully mitigate the sewage backup, allowing the HVAC to remain running, and failing to properly document damaged or destroyed personal property. Plaintiffs alleged that, as a result, they suffered both economic losses and property damage.

¶ 207   ServPro successfully obtained dismissal under the *Moorman* doctrine. "The *Moorman* doctrine, also known as the economic loss doctrine, states that there can be no recovery in tort for purely economic losses." *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 43 (citing *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982)).

¶ 208   The traditional rationale for the doctrine

"is that courts can trust the commercial parties interested in a particular activity to work out an efficient allocation of risk among themselves in their contracts [citation], without having to resort to tort law, which is better reserved for a sudden, calamitous accident as distinct from a mere failure to perform up to commercial expectations." (Internal quotation marks omitted.) *Id.*

"The *Moorman* doctrine arose in the context of product liability, but Illinois applies *Moorman* to services as well as the sale of goods because both business contexts provide the ability to comprehensively define a relationship by contract." (Internal quotation marks omitted.) *Id.* ¶ 45.

¶ 209   This court has recently clarified that there are three exceptions to the *Moorman* doctrine:

"(1) 'where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence,' (2) where the plaintiff's damages are proximately caused by a defendant's 'intentional, false representation, *i.e.*, fraud,' and (3) 'where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.' " *Id.* ¶ 48 (quoting *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199 (1997)).

¶ 210   In arguing for reversal, plaintiffs contend that the first exception to *Moorman* doctrine is applicable because they "sustained property damage resulting from a sudden or dangerous

occurrence." They posit that "biohazards from the toxic sewage created an immediate dangerous situation."

¶ 211    We agree with plaintiffs that the third amended complaint alleged facts implicating the first exception to the *Moorman* doctrine, warranting reversal of the dismissal of the negligence claim against Servpro. That is, plaintiffs alleged property damage resulting from a sudden or dangerous occurrence. Our court has recently noted that "Illinois courts have applied this exception to calamitous events, such as sudden roof collapses, sudden floods, and fires." *Id.* ¶ 49. We find this situation falls within the same category. In our view, the discovery by homeowners that their basement had been flooded with raw sewage (which had allegedly "become airborne" and spread odors and bacteria throughout the home) qualifies as a sudden calamitous event. We recognize that there may be factual disputes as to the precise nature of the event. Yet, upon a section 2-619 motion, we are to accept all well-pled facts in the complaint as true, as well as any reasonable inferences from those facts. *Sandholm v. Kucker*, 2012 IL 111443, ¶ 55. Construing the third amended complaint in the light most favorable to plaintiffs, they have alleged an event within the first exception to the *Moorman* doctrine.

¶ 212    We acknowledge ServPro's response that this exception should not apply because "the dangerous situation was already present for weeks" before ServPro entered the property. It is true that the sewage backup occurred around July 10, 2017, whereas plaintiffs did not discover it until they returned to their home on July 27, 2017. Yet, we fail to see how the mere passage of time before plaintiffs *discovered* the sewage backup changes its character as a sudden, dangerous, and calamitous event. ServPro does not cite any case suggesting that a delay before plaintiffs learn of the event affects whether the event was a "sudden or dangerous occurrence." Certainly, from plaintiffs' point of view, their discovery of the sewage backup was a "sudden" event.

¶ 213 ServPro also contends that the *Moorman* doctrine bars recovery because plaintiffs "did not allege physical property damage, but rather only economic loss." This is incorrect, as count III alleged "Plaintiffs have suffered both economic losses *** *plus additional damages including property damage* and *** loss of use of the Insured Property." (Emphasis added.)

¶ 214 To be clear, at any eventual trial, it will be plaintiffs' burden to prove recoverable property damage. Our decision does not preclude ServPro from relying on *Moorman* to bar any award of *economic* damages. Yet, after reviewing the facts alleged in the third amended complaint, we find plaintiffs sufficiently pleaded a negligence claim that falls within the first exception to the *Moorman* doctrine. Thus, we reverse the dismissal of that claim, count III of the third amended complaint.

¶ 215 K. Questions of Fact Precluded Summary Judgment on Plaintiffs' Breach of Contract Claim Against ServPro and ServPro's Counterclaim

¶ 216 1. Questions of Fact Exist as to Duress

¶ 217 In challenging the December 2023 order granting summary judgment to ServPro, plaintiffs assert the trial court erred insofar as it ruled that the authorization was an enforceable contract. They suggest that the authorization was never enforceable and that any contract with ServPro was an oral contract. Plaintiffs do not dispute that they signed the authorization, but argue that there were questions of fact as to whether they signed it under duress. In essence, they dispute the first element of a breach of contract claim: a valid contract. See *Zahdan v. Frontline Business Enterprise, Inc.*, 2024 IL App (1st) 221351, ¶ 31 ("The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by defendant, and (4) resultant injury to the plaintiff.").

¶ 218  In response, ServPro makes alternative arguments. First, it points out that plaintiffs' third amended complaint included a breach of contract claim (count X) that pleaded that "Plaintiffs entered into a contract with ServPro" and referenced the authorization, which was attached as an exhibit. Count X was labeled as an "Alternative Pleading." Nevertheless, ServPro argues that the third amended complaint contained judicial admissions that the authorization was a contract, such that plaintiffs are barred from disputing that it was an enforceable contract. Alternatively, ServPro argues that plaintiffs failed to allege or prove duress.

¶ 219  We first reject ServPro's contention that count X of the third amended complaint served as a binding judicial admission that the authorization was an enforceable contract. Judicial admissions are "formal concessions or stipulations that withdraw a fact from issue and dispense of the need of proof of the fact." *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 559 (2005). "[T]o constitute a judicial admission, the admission must clearly and unequivocally admit to the fact that is being removed from issue." *Id.*

¶ 220  We recognize that "[g]enerally, allegations contained in a complaint are judicial admissions and are conclusive against the pleader." (Internal quotation marks omitted.) *Roti v. Roti*, 364 Ill. App. 3d 191, 200 (2006). Nonetheless, given the liberal approach to pleading in the alternative, we decline to find that the factual allegations in the "Alternative Pleading" in count X were such binding admissions.

¶ 221  Although count X of the third amended complaint pleaded a breach of contract, we do not find it constitutes an unequivocal, binding judicial admission that the written authorization was enforceable. Rather, plaintiffs were simply pleading a theory of liability in the alternative. Count X of the third amended complaint was labeled "Breach of Contract Against ServPro

(*Alternative Pleading*)," and it followed plaintiffs' prior counts against ServPro for negligence (count III), violation of the Consumer Fraud Act (count VII) and Fraud (count VIII).

¶ 222    As an alternative pleading, count X was not binding and did not preclude other theories of liability. Notably, our court recently described the common practice of pleading in the alternative, explaining:

> "To be sure, Illinois is generous in its pleading rules. *** And we allow pleading in the alternative when a plaintiff has multiple claims that are contradictory. [Citation.] In fact, the alternative pleading of a breach-of-contract claim along with a quasi-contractual theory like *quantum meruit* is all but routine, even though the claims are mutually exclusive." *Finn v. Project Resource Solutions*, *LLC*, 2024 IL App (1st) 221016, ¶ 49.

Our court further stated:

> "A plaintiff loses nothing by pleading in the alternative; until trial, when the proof will show that one theory or the other (or perhaps neither) carries the day, the plaintiff maintains both options—but the defendant, at a minimum, is on notice of each theory and can prepare a defense accordingly." *Id.* ¶ 50.

¶ 223    It would be incongruous with *Finn*'s statement that a plaintiff "loses nothing by pleading in the alternative" to find that count X of the third amended complaint foreclosed plaintiffs from asserting duress as a defense to the enforceability of the authorization. We thus reject ServPro's invitation to construe count X as a judicial admission that the written document was a binding contract.

¶ 224    We proceed to find that questions about duress precluded summary judgment on the breach of contract claim.

¶ 225    "The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by defendant, and (4) resultant injury to the plaintiff." *Zahdan*, 2024 IL App (1st) 221351, ¶ 31. The issue of duress corresponds to the first element.

¶ 226    "A contract will be voided if it is the product of duress," which exists "if a party is induced by the wrongful act of another to make a contract under circumstances which deprive the party of her exercise of free will." (Internal quotation marks omitted.) *Set Environmental, Inc. v. Power Cartage, Inc.*, 2022 IL App (1st) 211403, ¶ 44. "Duress includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is deprived of the exercise of free will." (Internal quotation marks omitted.) *Id.*

¶ 227    Significantly, " '[d]uress is ordinarily a question of fact,' and it 'may only be decided as a matter of law where the undisputed facts lead to only one plausible inference.' " *Id.* (quoting *Potek v. City of Chicago*, 2022 IL App (1st) 211286, ¶ 57).

¶ 228    Here, the record indicates that more than one plausible inference may be drawn regarding the circumstances under which plaintiffs signed the authorization, giving rise to issues of fact that cannot be resolved on summary judgment. In the third amended complaint, plaintiffs pleaded that ServPro presented them with three documents they needed to sign before work could begin and that they were told there was no time to read them because "people were waiting on them in order to start work." Plaintiffs also pleaded that they were told that if they did not sign, they could be "deemed uncooperative" and could lose insurance coverage for the sewage backup.

¶ 229    There is at least some documentary and deposition evidence corroborating such allegations. In an October 1, 2017, e-mail, Jeffery Schaff told Travelers that plaintiffs "were told that our insurance company arranged for Servpro to start the clean up right away, which was necessary per

the terms of our policy, which required that we [mitigate] damage as soon as possible." He wrote that plaintiffs did "not believe we had any choice in the matter" and it "was represented that we cooperate with them or lose coverage."

¶ 230    Jeffery offered consistent deposition testimony. He testified that Doran told plaintiffs that people were coming and to allow them to "come in and remediate the damage immediately." Otherwise, "we fail to mitigate the damage and we're going to lose coverage. I'm going to send people over, and you have to let them go in and do their thing." Elsewhere, Jeffery testified that when ServPro arrived, it was his understanding that plaintiffs "were required to let them come in and clean things up, mitigate damage, otherwise, we're not going to get full coverage of our—full damage cost." He stated, "We were told we have to sign, so we did."

¶ 231    We recognize that plaintiffs signed the authorization, apparently without reading it. However, plaintiffs have alleged that they did so based on representations that they needed to rush to sign it in order to (1) allow remediation work to begin on the sewage-flooded basement and (2) to avoid losing coverage for failing to cooperate. Plaintiffs also alleged that the nature of the document was misrepresented to them. Certainly, a reasonable homeowner would be distressed to discover sewage in their residence and would want to take whatever steps to address the problem quickly. Under these circumstances and the record before us, we find there is a question of fact as to duress, *i.e.*, whether Servpro took "undue advantage of the stress of" plaintiffs to the point that they were "deprived of the exercise of free will." (Internal quotation marks omitted.) *Set Environmental, Inc.*, 2022 IL App (1st) 211403, ¶ 44.

¶ 232    We have found there is an issue of fact as to whether the written authorization was an enforceable contract between plaintiffs and ServPro. We note the possibility that a factfinder might

find the existence of an *oral* contract, even if it found that the terms of the written authorization were not binding.

¶ 233    This fact issue precluded summary judgment with respect to either plaintiffs' claim for breach of contract (count X) or ServPro's counterclaim for breach of contract. For this reason, we reverse the December 2023 grant of summary judgment in ServPro's favor.

¶ 234                    2. Questions of Fact Exist As to ServPro's Performance

¶ 235    We have thus held there are questions of fact as to whether the authorization was an enforceable contract or whether there may have been an oral contract. Such questions preclude summary judgment and require reversal of the December 2023 summary judgment order in ServPro's favor.

¶ 236    In any case, we also note our agreement with plaintiffs that the record presents questions of fact as to whether ServPro fully performed. This is true, even assuming the authorization is determined to be an enforceable contract.

¶ 237    The authorization indicated that ServPro would "perform any and all necessary cleaning and/or restoration services on Customer's property *** and with respect to items that need to be cleaned at a remote location to remove and clean such items as necessary."

¶ 238    In count X of the third amended complaint, plaintiffs alleged that ServPro breached a contract through various acts and omissions that caused them to be "left with a home that was not properly remediated and is still a biohazard." These acts and omissions included failing "to follow proper mitigation protocols," failing to "mitigate the entirety of the sewage backup damage," failing to properly dehumidify the basement, allowing the HVAC system to remain running, and failing to "property document the personal property removed" from plaintiffs' residence.

¶ 239 We keep in mind that summary judgment is a "drastic remedy" that should be granted only if the movant's right to judgment is "clear and free from doubt." *Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 35. A court must "be cautious in awarding summary judgment 'in order to avoid preempting a litigant's right to a trial in which the litigant may fully present the factual basis of his or her case.' " *Id.* (quoting *Schuster v. Occidental Fire & Casualty Co. of North America*, 2015 IL App (1st) 140718, ¶ 16).

¶ 240 With this standard in mind, we find the record shows one or more issues of fact. In arguing to the contrary, ServPro points out that it submitted an affidavit from its president averring that ServPro completed remediation at plaintiffs' residence in accordance with professional standards. Servpro also cites a portion of the October 2017 report from Environmental Initiatives, stating its tests suggested that sanitation of the affected floor was properly completed and that an abnormal release [of bacteria] into the supply ductwork had not occurred."

¶ 241 ServPro also claims that plaintiffs failed to rebut the opinion of its retained expert that ServPro adequately completed the remediation. ServPro also points out that, at one point, plaintiffs rated ServPro 10 out of 10 in five out of eight categories.

¶ 242 Certainly, at an eventual trial, such evidence could be viewed in ServPro's favor by a factfinder. However, we do not think such evidence foreclosed any issue of material fact for purposes of summary judgment. Rather, we find sufficient evidence in the record from which a trier of fact might find that ServPro breached.

¶ 243 Such evidence includes the report of plaintiffs' expert, Dr. Cole, who opined that ServPro failed to "recognize and address the distribution of the sewage contamination through the entire Schaff home," which was an "abrogation of professional responsibility to restore the home to a pre-loss condition." Dr. Cole also stated that

"sewage residue on the walls up to the flood line wasn't cleaned or treated in any way, and neither was the ceiling, which is the subflooring for the upper level. Additionally, the basement was open to wall assemblies that go up to the main level of the house, and constitute additional pathways for the spread of contamination throughout the entire home, yet they were never addressed."

Dr. Cole also opined that ServPro likely exacerbated the contamination, as it failed to "shut the HVAC system down to prevent further distribution of contaminants, once it began the remediation process."

¶ 244      Further, the October 2017 report from EI found elevated concentrations of bacteria in the return ductwork, which was "unexpected." EI stated it "cannot conclude if these results indicate contamination from the sewage loss. Without additional data, we error [*sic*] on the conservative *and assume the return ductwork was impacted by the recent sewage release*." (Emphasis added.)

¶ 245      Moreover, insofar as the third amended complaint alleged that ServPro breached its contract by failing to fully and accurately inventory plaintiffs' personal property, Jeffery Schaff's 2017 e-mails and deposition testimony provide some evidence in plaintiffs' favor.

¶ 246      Of course, we do not purport to assess the credibility or weight of such evidence, which is the role of the trier of fact. We simply determine that the record presented one or more questions of material fact as to whether ServPro breached its contractual obligations. This determination independently warrants reversal of the order granting ServPro summary judgment with respect to both plaintiffs' breach of contract claim (count X), as well as the breach of contract claim in ServPro's counterclaim.

¶ 247      In summary, with respect to ServPro, we reverse the dismissal of the Consumer Fraud Act Claim and the negligence claim. Because questions of fact exist as to whether duress precludes

enforceability of the written authorization, we also reverse the entry of summary judgment on plaintiffs' breach of contract claim and ServPro's counterclaim.

¶ 248     We thus remand for further proceedings with respect to these claims and ServPro's counterclaim. We note that, insofar as the court relied on a jury waiver clause within the authorization, that order must be reversed in light of our determination that questions of fact exist as to whether that document was a binding agreement. That is, plaintiffs' jury demand should be reinstated.

¶ 249          L.   HUB's Cross-Appeal From Denial of Motion for Rule 137 Sanctions

¶ 250     We have now addressed plaintiffs' contentions on appeal. We turn to address HUB's cross-appeal from the February 2014 denial of its motion seeking Rule 137 sanctions. HUB sought sanctions on the basis that plaintiffs filed a frivolous motion for reconsideration after the court entered summary judgment in HUB's favor.

¶ 251     Rule 137 provides that every pleading or motion must be signed by at least one attorney of record. Ill. S. Ct. R. 137(a) (eff. July 1, 2013). An attorney's signature "constitutes a certificate by him that he has read the pleading, motion or other document" and that, to the best of his knowledge,

> "it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Id.*

If a motion is signed in violation of this rule, a court "may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include *** the amount of reasonable expenses incurred because of the filing *** including a reasonable attorney fee." *Id.*

¶ 252    The purpose of Rule 137 is to prevent abuse of the judicial process by penalizing claimants who bring vexatious and harassing actions. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 285-86 (2001). "The trial court's decision to impose sanctions is within the sound discretion of the trial court, and that decision will not be disturbed on review absent an abuse of discretion." *Law Offices of Brendan R. Appel, LLC v. Georgia's Restaurant & Pancake House, Inc.*, 2021 IL App (1st) 192523, ¶ 63. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 253    Under our deferential standard of review, we do not find the trial court abused its discretion in declining to impose sanctions based on plaintiffs' motion for reconsideration. We recognize that the motion for reconsideration was without merit, insofar as it was premised merely on the legal opinions of plaintiffs' purported insurance expert. Yet, the trial court apparently determined that the motion was not so frivolous or improper as to warrant sanctions against plaintiffs' attorney. It was within the trial court's discretion to make that determination, and HUB does not convince us that it abused that discretion.

¶ 254    HUB directs our attention to *Kellett v. Roberts*, 276 Ill. App. 3d 164 (1995), for the premise that sanctions are appropriate where a motion for reconsideration is not new in substance. That case is plainly distinguishable, insofar as the motion for reconsideration at issue in that case was directed to a prior award of sanctions. Specifically, the court in *Kellett* had awarded Rule 137 sanctions against defendant's counsel for filing a third-party complaint without ensuring it had a sufficient factual basis. See *id.* at 168. After defendants moved for reconsideration of the sanctions order, plaintiff responded that the motion to reconsideration was itself sanctionable. *Id.* at 168-69. The trial court agreed and awarded additional fees based on the motion to reconsider. *Id.* at 169.

On appeal, our court affirmed the order of sanctions for the third-party complaint; the court also affirmed sanctions for the motion to reconsider because it "did not present any factual matters to demonstrate that the imposition of sanctions was improper." *Id.* at 174. Insofar as *Kellett* concerned a motion to reconsider from a prior award of sanctions, it is plainly distinguishable. It does not convince us that the trial court abused its discretion when it declined to award sanctions in this case, even if the motion to reconsider was meritless.

¶ 255    In urging that the trial court erred in denying sanctions, HUB also emphasizes that the trial court denied its sanctions motion before it issued its decision on plaintiffs' motion for reconsideration. HUB suggests this means that the court did not make an "informed ruling" when it declined to award sanctions. We disagree. The timing simply indicates that the trial court first determined that the motion for reconsideration was not so improper as to justify Rule 137 sanctions, before deciding that it was without merit.

¶ 256    In short, we cannot say the trial court abused its discretion in declining to impose Rule 137 sanctions based on plaintiffs' motion to reconsider. Thus, with respect to HUB's cross-appeal, we affirm the denial of its motion for sanctions.

### III. CONCLUSION

¶ 257    In summary, we reverse the trial court's order concerning plaintiffs' breach of contract claim against Travelers (count I) and remand for proceedings on that claim. We otherwise affirm the appealed-from trial court rulings with respect to plaintiffs' claims against Travelers and HUB. As to ServPro, we reverse the dismissal of the Consumer Fraud Act (count VII) and negligence claims (count III). We also reverse the entry of summary judgment in ServPro's favor on plaintiffs' breach of contract claim (count X) and ServPro's counterclaim. We affirm the denial of HUB's motion for Rule 137 sanctions.

¶ 258  Accordingly, we remand for the trial court to conduct further proceedings consistent with this order.

¶ 259  Affirmed in part and reversed in part.

¶ 260  Cause remanded.

---

*Schaff v. Travelers Home & Marine Insurance Co.*, **2025 IL App (1st) 240276**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-L-007588; the Hon. Daniel J. Kubasiak, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David A. Eisenberg and Alexander N. Loftus, of Loftus & Eisenberg, Ltd., of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Rostyslaw J. Smyk, of Rubbery, Stalmack & Garvey, LLC, of Chicago, for appellee Hub International Midwest, Ltd. |
| | Michelle L. Carey, of Servpro, of Wheaton, for appellee G.W. Nitzsche, Inc. |
| | Thomas B. Orlando, of Foran Glennon Palandech Ponzi & Rudloff PC, of Chicago, for other appellees. |

---